

**OFFICIAL RECORD**
Document participants have digitally signed.
All signatures have been verified by a
certified FBI information system.

## FEDERAL BUREAU OF INVESTIGATION

Date of entry     08/05/2013

SA Cauthen listened to evidence items 1D1 and 1D2 containing recordings of an interview of Matthew Keys. SA Cauthen prepared the following based on his review of the items:

PARTICIPANTS

MK: Matthew Keys

GA: Special Agent Gabriel F. Andrews

JC: Special Agent John M. Cauthen

ABBREVIATIONS

UM1-14: Unknown Male Voice #1 through #14

UMS:Unknown Male Voices

UI:Unintelligible

JC: I think you're aware of what we're going want to address. But you know [UI].

MK: Does the door need to be open?

JC: No, that's why we want to go a different [UI]. This is a copy of your search warrant. Ok.

MK: Ok.

JC: We're going to give you plenty of time to read that. We're going to answer all of your questions. Before we do, even though we're not going to arrest you, uh today, we are going to go through our standard Miranda warning. So, we'll read that to you.

GA: So let's do that right now, just get it out of the way. So, this is basically [UI]. Before we talk to you, you have the right to remain silent. Anything you say can be used against you in a court. You have the right to

---

Investigation on   10/04/2012   at   Secaucus, New Jersey, United States (, Other (Review Tape Recordings from Interview on 10/04/2012))

File #   288A-SC-45485, 288A-LA-258500                                    Date drafted   07/18/2013

by   CAUTHEN JOHN M

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

Continuation of FD-302 of   Transcript 1D1 & 1D2                    , On   10/04/2012  , Page   2 of 86

talk to a lawyer for advice before you ask questions. You have a right to a
lawyer during your questioning. If you can't afford a lawyer, one will be
appointed to you before any questioning. And, if you decide to answer
questions now, at any point, you have the right to stop. Ok?

MK: Yea.

GA: And, this is all something we'd read if you were to be under arrest.
Again, you're not. [UI]

MK: Before we all start.

JC: Tell you what, we're going to answer all of your questions. I can tell
you're kind of [UI] unease a little bit.

MK: I had people wake me up in the middle of the night. [Laughter]

JC: And, and that's completely understandable. So, we're just, we're just
going to [UI]. Uh, by the way, I'm John Cauthen. You probably recognize
[UI]

MK: Matthew. I have spoken with you before.

JC: You have.

MK: Yes, I have.

JC: So, I'll tell you what.

MK: Four stories and not.

JC: What we want to do here is put you at ease. Answer all of your
questions.

MK: Mmm hmm.

JC: And, uh, and I think we want to work with you on this, ok? Cause I
think you have a lot of things you want to tell us, and we'll explain
everything to you. Alright?

GA: [UI]

JC: What we want to do is –

MK: Ummm.

JC: -- take you to a place where you're not with your roommates and [UI]

for you.

MK: You know what, we can do either. It doesn't matter to me.

JC: Ok, well, what are you more comfortable with?

MK: I am –

JC:I'll tell you what, you know what. Let's go to another location. Just to make it easy for . They got another room, I think. And then –

MK: I, I think I would rather be here.

JC: Ok.

MK: If that's ok.

JC: Ok, then that's what we want to do. Alright. You want to do it in this room? Or?

MK: We can do it in here if you like as long as I don't have anything to be worried about. And, I don't, I want to make sure you guys don't have anything you're worried about.

JC: Well, uh –

MK: We'll be ok.

JC: I think we cleared the room. Do you have anything dangerous in the room or anything?

MK: No.

JC: Ok. Do you have a chair or something we can sit on or?

MK: I don't. We can grab one from the dining room.

JC: Thank you. Let's get some chairs. I'm going to take my jacket off if that's ok.

MK: And, I apologize for the mess.

JC:Oh, I understand. And, you've only been here about a month as I understand? Is that right?

GA: [UI]

JC: So, uh.

Continuation of FD-302 of  Transcript 1D1 & 1D2 _____ , On  10/04/2012 , Page  4 of 86


[UI Portion -- 0:00:19 seconds]

JC: So, you know why we're here, right?

MK: Yes, I know. [UI]

JC: I know, I'm, I'm sorry. And, you know, I don't want to blow this thing out of proportion either. I mean –

MK: You have a job to do, and I have a job to do so I understand.

JC: Ok. Here's the thing. Uh, I think after you go through that. I'm going to answer all your questions and my partner here, Gabe, he's from Los Angeles FBI.

MK: Hi Gabe. Matthew.

GA: How you doing Matt?

JC: He's, we're going to be as helpful as we can [UI] which I know is difficult for you.

MK: Can I take a look at this real quick?

JC: Yea.

MK: I just –

JC: Yea, I'll talk to you as we're going.

MK I just want to scan through it.

JC: Yea. So, uh -

GA: One of the things I wanted to bring up to you, I'm sure you recognize this.

MK: Yes, I have a copy of it on my desk.

GA: Nice. I've been reading through it a bit myself. Uh, you know I saw the, the Twitter post where you mentioned the book and gave her a plug, and she responded and –

MK: [UI]?

GA: Yea.

Continuation of FD-302 of   Transcript 1D1 & 1D2 _____ , On  10/04/2012 , Page  5 of 86

MK: Yea.

GA: In the back she actually, as you mentioned here briefly, that, you know Keys was invited to observe the goings on in the InternetFeds room December 2010 to January 2011 using the name AESCRACKED. You, uh, provided her a number of logs to help her with [UI].

[UI Portion – 00:00:09 seconds]

GA: -- She picked it up from your logs.

MK: I think she picked it from the logs.

JC: So, you just gave her the raw logs showing it was AESCRACKED and all the chats with everything?

MK: I gave her some of the raw chat logs, correct.

JC: Ok. Oh, some of them. So, you didn't give her everything? Alright.

MK: I don't remember if I gave her everything that I had.

JC: Alright.

MK: I took quite a few logs while I was, while I was in the chat room.

JC: Well, we've got a number of the logs in there, uh, as well, that you're going to be able to read.

MK: I saw some of those [UI].

JC: I think that's from your – But, we've actually got the raw cuts. We got the whole thing, essentially is the bottom line. Uh, your conversation.

GA: When you were doing this, did you use other usernames other than AESCRACKED?

MK: I may have. To be honest with you, I don't remember.

GA: You don't recall off the top of your head?

MK: I, I – It happened a year and a half ago.

JC: Yea.

GA: I understand.

JC: Well, here's what we want to do here today, Matt. We want your help in

Continuation of FD-302 of  Transcript 1D1 & 1D2                                          , On  10/04/2012 , Page  6 of 86

terms of –

MK: There were some on one page that I saw here. The first or second page and [UI].

JC: There's a probable cause statement that shows some of the logs. This is not everything obviously. And, items that we're going to be taking.

MK: These are not me.

JC: Ok.

MK: Um.

GA: Right.

JC: Well, that's why we want – And, some of those people you actually did talk to those people and that's a large part of why we're here today.

MK: Like some of these names I don't even recognize.

JC: And, that's why we want to talk to you, too. Because, you know, there still are people out there.

MK: Yea.

JC: And, you've heard about Sabu, and all of those guys that have been wrapped up and a lot of the folks overseas. And, you did have some involvement with those folks so we're going to ask for two things. One is we're going to ask for your help in what you can help us with on those folks. Two is – and this is extremely important and we're going to ask for extreme candor. I mean, we want you to be truthful and not mislead us. And, I don't think you're going to want to do that.

MK: Define extreme candor.

JC: Well, not trying to lie. I don't think you're going to do that. You don't seem like the kind of guy who wants to do that, and I think what happened in the past was just a mistake and you're going to want to move past that and help us out. Am I, am I right in that?

MK: Yea.

JC: Ok. So, so that –

MK: What are the consequences?

288A-SC-45485

Continuation of FD-302 of  Transcript 1D1 & 1D2                          , On  10/04/2012  , Page  7 of 86

JC: Well, I mean, you can read that – I don't, I don't know what the
consequences are. I mean, here's the bottom line. We'll cover the whole
thing, but the bottom line is we've got two issues. Uh, the first issue is
how you helped these guys in Anonymous. They actually did cause some
damage. No, you didn't actually do the hack, but you did give them the
passwords to Fox, to the CMS. And, and that's an issue we got to address.
And, so we're going to expect you be candid about that because we got those
records, and we can prove that. You understand?

GA: You'll be able to keep this, by the way. So this [UI].

JC: Yea, this is your copy.

GA: But, you'll have this when we leave.

JC: So –

MK: Remind me again what your name was?

GA: It's Gabriel.

JC: It's Gabe. Gabriel.

JC: I'm John.

JC: You're not going to forget that.

MK: No, your name – I know who you are.

JC: I know.

MK: Yea.

JC: So –

MK: What do you do Gabriel?

GA: Um, same thing as John, basically.

MK: Ok.

JC: But, here's the thing, I mean we, we already know in the scheme of
things where you stand and how you can help us, and that's all we're going
to ask you. Just, you know, how can you help us. We're going to ask for,
you know, we got a search warrant actually to get all of the logs off your

computer. Ok. But, it's going to help us a lot if you just tell us where those logs are. If there's more. If you've got them in the cloud, or if you've just got them on the computer.

MK: I can give you, um, as far as. There, there is a hard drive that, um, has a zip file with the logs that I kept that I, I remind, you know, I –

JC: Ok. Yea.

MK: This computer I didn't own at the time if you want to take a look at it.

JC: Alright.

MK: I mean you're going to anyway. Uhm

JC: Is the zip file encrypted, or?

MK: No.

JC: So, it's a straight. Where is that hard drive?

MK: I believe it's in there.

JC: Ok. So, you know what we're going to do.

MK: And, I can show you on the computer how to get access to those.

JC: Ok. Well, trust me when I say I don't want to turn your life upside down and make this more difficult for you than it is cause I understand that you're probably mildly upset. But, we'll work with you on it, ok? To the extent that we can leave you with this computer, we'll do that. And, we'll get those logs because that's all we're really asking for and then your cooperation. And, then finally, uh, you know, we don't want any minimization in terms of what your role was, you know. Sometimes people do have a tendency to, uh, kind of minimize what they did. And –

MK: I don't know anything about computer hacking.

JC: I know.

MK: That's the [UI].

JC: And, we believe that. We believe that. Having said that, it did happen, and it wouldn't have happened without your help. So, we need you to take

responsibility in the sense that if you do try to kind of say, well, I didn't do it, or I didn't have a significant role in it. Still 6 o'clock? What time you got to go to work?

MK: Uh, I had to be up at 8.

JC: Alright, so we got some time.

MK: Yea.

JC: But, what I'm saying is, you know, we're going to cover everything from the time you left Fox News, ok? All the way through. And, at the end of the day, you know, we just want you to [UI] and be truthful about everything. And, and to the extent that you do feel some remorse, honestly Matt, that goes a long way with people who look at people like yourself who are normal, decent people that just made a mistake. And, you had circumstances at the time that might have caused that mistake, and that's understandable. So, I think you are going to be remorseful. I think you're going to tell the truth and, uh, and, that's all worthy. Ok?

MK: Yea.

GA: [UI] you can help us catch some of the other guys too.

JC: Which is –

MK: The concern that I have is more or less for my career. You know, I know how these things –

JC: We're going to work with you to the extent that we can. We're not here to harm your career. Ok? Our goal is to obtain the truth.

MK: Right.

JC: Ok? So, like I said today. We're going to leave here today, and we are and you're going to leave here today. You're not going to jail today. Ok?

MK: Key word being "today."

JC: Well, you know, even I can't predict the future. But, here's what I can predict. Uh, you know, knowing your role in it, unless there is something I don't know, ok, because as far as we can tell at this point, and you know, we're going to find it out as we look at your stuff and your computers even more I guess if there's something we don't know. But, we know what happened at Fox40 News with the emails and essentially the CMS server, your access of passwords, and your involvement with Anonymous. Ok.

MK: Which was minimal, at, at best.

JC: You were not a hacker, per se, but at the end of the day, you did take
emails from Fox40 that you shouldn't have, ok. And, screw with them and
cause them consternation.

MK: Hey, I didn't really take –

JC: Well, stop for a second. And, then, more importantly, and the real
reason we're here is giving the passwords to those guys that caused the, to
the, uh, that ultimately resulted in the hack at the _LA Times_. You didn't
do the hack, but you gave them the passwords. And, you can't unwind that.
And, whatever the moment or cause, I, we can, we can understand what
happened.

MK: Yea

JC: Alright. So, that's essentially – is there anything else that, beyond
that?

MK: No. I didn't have access to anything else.

JC: Ok. Well, Gabe is going – I am going to go get –

MK: My involvement was, involvement with them, ended kind of rough.

JC: Yea, I understand. And, that's probably to a large extent why we even
ended up here today because it was a contentious relationship with, with
them, and it's understandable.

MK: Well, they were upset that stuff was getting out that they didn't want
to get out. I mean, as you're probably aware.

JC: Sure. I don't know all of the details so, we're going, I mean what we
would like to do –

MK: I, unfortunately, don't remember all of the details.

JC: We'll refresh your memory of what we know, and to the, and uh, is it ok
if we take some notes?

MK: Yea.

JC: Ok. Gabe, I'm going to get a chair for you to sit in and make some
notes if that's ok.

GA: Yea, thank you.

JC: I'll be right back.

JC: Oh, I got the wrong room.

JC: This is going to go pretty easy. He, uh, he's got an Apple that's on, it's not encrypted. He's cooperating, but he says this thing's new. So, what I might do is just, uh. I don't think we're even going to need it. He's got a hard drive which has all his stuff on it.

UM1: Oh.

JC: So, I'm thinking we preview that on site. If it's got all the logs we take that hard drive.

UM1: Ok.

JC: So I would fire up a laptop. It's a zip file.

UM1: Do you have a – Can you give me, can you bring out the hard drive? Or –

JC: Yea.

UM1: Find out what the interface is just so I know.

JC: Yea.

UM1: [UI]

JC: I'll get the [UI]. I'll get the hard drive and bring it out.

UM1: And, there's another Apple in the closet.

JC: Oh ok. [UI] It's, it's going to be fine.

UM2: [UI]

JC: Oh yea, I'll ask him if he wants [UI]. So, what do we got in the fridge? Coke, something?

UM2: [UI]

JC: Alright.

UM2: [UI]

JC: Alright.

Continuation of FD-302 of  Transcript 1D1 & 1D2 , On 10/04/2012 , Page 12 of 86

UM2: [UI]

JC: Sorry about that. Did you want something to drink, Matt? Or some water? I know there's a Coke in the fridge or something.

MK: No, but in the fridge there's a water jug that's got a red cap on it.

JC: Can I get that for you?

MK: Yes, please.

JC: Alright. Water bottle in the fridge, red cap.

[Pause 00:00:36 seconds]

MK: [UI] water.

JC: [Laughter]

MK: [UI]

(FBI Note: About this time the second recording commenced – Evidence Item 1D1)

JC: It's alright.

MK: Um, otherwise, right now I probably would have helped. Um. One of the things that I did before I joined Reuters was I invited him to have coffee. Tribune Company [UI] Reuters client. Um, I decided that if I were to get the job at Reuters I would want there to be some closure and as little animosity as possible. So, I invited him out, and we didn't talk, you know, about anything other than the industry, what was happening at the station, what was going on with what I was doing. At the time I worked at ABC. And, um, I think it was very cordial. We left on good terms. I sent him a few emails and haven't heard from him most of the time. Uh, but, some of the times he was very responsive. You know, I told him, I sent him an email when I started at Reuters saying this is my mailing address, I'm still getting mail to my old address, you need to have these for your records.

GA: Ok.

MK: Um, so I would say that when my employment ended, it ended kind of gruff. And, then, it eventually, you know. It got better. Time, time makes everything better. So –

GA: Sure. Ok. So, that happened about when then? You came out here sometime around January, right?

MK: January 18.

GA: So, you sat down with him about January of this year.

JC: And, who was that?

MK: Brandon.

JC: Ok.

MK: I sat down with him, um, middle of December of the previous year when I was still living in California. And, that was the only time that he and I sort of had a face-to-face after I had left Fox. And, like I said, it was a very pleasant meeting. We were very cordial. Um, if you were some stranger looking at us at the coffee shop, you would never have known that you know he had let me go.

GA: So, not too many cups of hot coffee thrown at one another.

MK: No, it was very nice. Brandon is –

JC: Time, time does heal wounds, doesn't it?

MK: Well, Brandon is a very nice guy. And, you know, I think he thought, he thought that I was a very nice guy, too. So –

JC: Well –

MK: And, I –

JC: I think you are, too, yea.

MK: We, we both understood what happened, you know. It took me a while because I was very upset.

GA: Mmm hmm.

MK: But, we both understand that the reason why, you know. We, we both understood the reason why it happened.

GA: What was that?

MK: Well, I think we just had different, different ideas as to how we wanted to achieve that end-goal, you know. Ideally, they wanted to build a news website that was backed off of, you know, cheap content, so to say. To get, [clears throat]. Excuse me. To get paid to use that, they would then turn around and sell ads and –

Continuation of FD-302 of  Transcipt 1D1 & 1D2                              , On  10/04/2012 , Page  14 of 86

JC: Mmm hmm.

MK: And, I wanted to build smart content, and they wanted to go for easy content if that makes sense. It would be the di- , it would be like saying you wanted to try to get traffic for Charlie Rose interviews, and they wanted to get traffic for cat videos. So [UI]

JC: Yea.

MK: Does that analogy make sense?

JC: Uh, perfectly.

MK: I'm trying to explain it to people that might not –

JC: Well, we've got a pretty good sense because we've, we've read your, uh, you know, Producer Matthew pages. So, I've got a pretty good sense of professionally where you're coming from. And, uh, how serious you take your job and, and uh –

MK: Well, that's why I think [UI].

JC: -- your background in it.

MK: -- concern me[UI].

JC: Huh?

MK: I said that's why I things like this kind of concern me.

JC: Well, and, and we are certainly, we can appreciate it. So, you know. But, it is what it is. We can't change what happened. So, you're doing the right thing. So, uh, when you left, this would, this would have been 2010, probably November. It was on –

MK: I left, I left middle of October 21, I think of 2010

JC: Ok. That's right.

MK: 2011.

JC: And, uh –

MK: 2010.

GA: 2010

MK: Yea.

JC: You left, and so, the first thing I noticed is we had this issue with the email or there was an argument with Brandon about the Facebook and Twitter accounts. And, then you had an issue, and then the emails started. And, then Anonymous. Now, I want to make sure I got that sequence right. When you talked, when you first got involved with Anonymous, you know, what was, what was going on in your mind at the time? And, what happened exactly in that fall period? In the turmoil of –

MK: I was bored and I felt stuck. And, I have always sort of been interested in trying to get to like the scene of a story.

JC: Mmm hmm.

MK: Or, to the heart of the story.

JC: Mmm hmm.

MK: And, this was a group that I really didn't know a whole lot about. I kind of learned about it when the rest of common America heard about it.

JC: Sure.

MK: This attack, uh, this PayPal attack on Visa and Mastercard and PayPal and. Sorry, this WikiLeaks attack on Visa and Mastercard and PayPal. Um, let me just start off by saying, I have no knowledge of anybody involved in WikiLeaks. Uh –

JC: [Laughter]

MK: I as a journalist have read their material, you know. Um.

JC: That's fine.

MK: I'm not privy to any material that they're coming out with in the future. I'm not privy to any material [UI]

JC: We're not here for that, obviously. But, I appreciate you mentioning that.

MK: Just wanted to get that out. Um, so I popped into the chat room that was a, the generic operational chat room for whatever that happened to be at the time.

JC: And, did you use, what, did, how did, how'd you pop in? I mean are you a cha-, are you an IRC guy, or how did –

288A-SC-45485

Continuation of FD-302 of  Transcript 1D1 & 1D2 , On 10/04/2012 , Page 16 of 86

MK: I've used IRC in the past.

JC: Now, what did –?

MK: Um.

JC: What application did you use for IRC?

MK: Colloquy.

JC: Colloquy?

MK: Does that sound right?

JC: Ok. And, when you first popped in, uh, did you just pop in as a, as a lurker?

MK: Initially, yea.

JC: And, what was your user ID at that time?

MK: I think that was the AESCRACKED one.

JC: Ok.

MK: It may have been something else, but I think that's what I was using.

JC: How did you come up with AESCRACKED? Was that part of a design to kind of appeal to the hacker community?

MK: Part of it. Yea. The passwords that, there was, there was a data file that was released by I think by WikiLeaks by a torrent site that had the diplomatic cables.

JC: Mmm hmm.

MK: And, it was locked with AES encryption.

JC: Ok.

MK: I didn't know what that was at the time.

JC: Ok.

MK: I know they would.

JC: Yea.

MK: And, so.

JC: So, it was in part-

MK: Kind of like, kind of like what people do when they're interrogating
another person, you talk at their level.

JC: Uh huh.

MK: Um, we do that as journalists.

JC: Sure.

MK: We talk at the level. Um, and that means, you know, part of that is
just appearance, you know. If you go to a dressy event, you dress
appropriate. If you go to an event that's a little more casual, you dress
casual. You, you look the part for whatever the appropriate scenario might
be. I didn't mean, I, you know, I don't think that, especially the people
that would talk to me, I don't think they ever got the sense that I knew
most of the time what was going on.

JC: So –

MK: Would you mind if I turned this fan off?

JC: Of course, go ahead.

[Movement, shuffling]

JC: Oh ok. Well, if you want to put something else on. That's ok too.

MK: Yea, I think there's a sweat jacket [UI].

JC: Yea.

[Shuffling]

MK: And, there's nothing in here either.

GA: Oh.

MK: If you'd like to try.

JC: Yea, we can do that.

MK: Um, so when [UI]at the time [UI] you look the part[UI].

JC: Mmm hmm.

MK: If you're going to a county fair, you dress down. If you're going to a dressy event, you dress up. And, of course, that's irrelevant with what I was doing because I was doing this from my bedroom in Sacramento. You're based in Sacramento, correct?

JC: Yea.

MK: Ok.

JC: So, were you logging at that point trying to save a log of the idea of kind of doing the research on this?

MK: I think my computer was probably saving something, but I wasn't.

JC: Ok. Not intentionally, you're just researching at this point.

MK: I had, um, you know there are options on Colloquy where it can save a log.

JC: Yea.

MK: And, I had gone through and turned them all off.

JC: Ok.

MK: Um.

JC: Why did you do that?

MK: Because I knew that if I did have something and I had text logs that detect, you know, if I were to bring these to somebody. I am just a web producer that worked at Fox, you know.

JC: Mmm hmm.

MK: I'm not, you know, a deputy social media editor for Reuters. Um, what kind of pull would I have? And, I knew that somebody looking at those text documents would go, 'Those have been altered.' Uh, Or, those could have been altered.

JC: Ah, yes.

MK: I should say. Um.

JC: Is that, what, why – I am not sure I'm following. That's why you turned it off or didn't want to do the logging or?

MK: I didn't want to do the logging because I didn't know what was going to happen.

JC: Ok.

MK: And, I didn't want anything incriminating left on my computer that you know could be tied to my name or may not have been tied to my name. I felt like it was at the time it wasn't a completely rational thought, but I thought that maybe that would give me an extra layer of protection –

JC: Ok.

MK: -- between what they were doing and what I was doing at the time. What they were doing was –

JC: Yes.

MK: -- attempting to do some damage.

JC: Yes.

MK: What I was doing was mainly just being an observer.

JC: Right and that wasn't your intention at that, at that point, certainly.

MK: Eventually, later on, when I did start taking logs, it, I didn't do those with text either. There might be one or two text logs that I took just because the data was so gratuitous that there would have been no way to have captured it in a text file.

JC: Sure.

MK: So, which is why, and I, I know you g-, I've seen these here. You have screen grabs that –

JC: Your screen grabs. So, you were doing screen grabs.

GA: Look like this

JC: Yea[UI]

MK: You, it's harder to manipulate –

JC: Yea.

MK: -- an image, and when an image is manipulated you can usually run it through software and detect whether or not it has.

JC: Mmm hmm.

MK: As with that, that was obviously manipulated because it was redacted.

JC: Sure.

MK: Um. But, when you're forward with a journalist like Parmy and you say something has been redacted, you know. They're usually a little more –

JC: Yes.

MK: There a little more, uh –

JC: It's more credible. It has, it has more weight.

MK: Right, exactly.

JC: Yea.

MK: Right. So, initially going in there as, as a lurker, and I think it was in, I want to say their, their room at the time was like Operation Payback or something like that.

JC: Ok.

GA: May I ask, before we go, how did you first find out like where to go?

MK: Twitter.

MK: And, this was two years ago before Twitter –

JC: Became famous. Yea.

MK: -- is what it is now. I mean it is, it was –

JC: It had started, but yea.

MK: It had started to gain a sense because, you know, Obama and Oprah had joined. [Laughter]

JC: [Laughter]

MK: There were so many people on it. Um. But, it wasn't being used in sort of the sense that it's being used now.

JC: Not as a communication medium, no.

MK: Where you had like 17,000 Tweets between Big Bird last night, you know,

288A-SC-45485

Continuation of FD-302 of  Transcipt 1D1 & 1D2 _____, On 10/04/2012 , Page 21 of 86

because of the debate. Um. That didn't happen two years ago. Instead you had people actually having a discussion, and in monitoring the discussion that was going on on Twitter. I mean you still have people that are having discussion. I don't want to sound, um [rumbling noise]. What's going on?

JC: I don't know. And, uh, they're, uh, we're not here, they're not going wreck it, so don't worry. It'll be –

GA: If anything, they're moving a chair back in towards the table or something along those lines.

JC: If you want to go out and, and see what's going on, I don't have a problem with it.

MK: No.

JC: So, uh, you, you, you got it from Twitter, you went to Operation Payback, you're, you're there.

MK: There Twitter account, there was a Twitter account that had been set up, and they were mentioning things like the Low Orbit Ion Cannon an, which I still don't really understand what that is or how that operates or—I just know it's a thing.

JC: And, so you didn't do any type of denial of service attacks?

MK: No.

JC: Ok.

MK: No.

JC: So, you're clearly, uh, just at this point really just researching it and trying to understand where they're coming from, talk to people. Who did you meet? Do you remember anybody?

MK: I don't remember anybody that I met in the chat room.

JC: Ok.

MK: I think I was trying to make a little bit of a noise and it, nothing jumped out. Um.

JC: Hard to do in that group.

MK: Well, it's hard to do in general because there was so much interest in it that you had, you know, that, at the time, I don't think there was like

Continuation of FD-302 of  Transcript 1D1 & 1D2 _____ , On  10/04/2012 , Page  22 of 86

a press room set up.

JC: Yea.

MK: Or, you know, like at one point they did create a press room where journalists could go in there and talk to them and they would it was sort of like spin alley –

JC: Yea.

MK: -- for the, for Anonymous. And, I remember, um, you know, just throwing things out there. I, I don't remember what was said, and just not getting any kind of reaction.

JC: Alright.

MK: And, had I said, you know, 'I'm Matthew from CNN' or 'I'm Matthew from you know this big news organization,' they would have latched on I think a little bit more. But –

JC: Maybe.

MK: [UI] I'm Matthew the unemployed journalist, you know. They're more interested in how you can help them than they are in –

JC: Of course.

MK: Um, you know any kind of story that you would want to do.

JC: I think you have a good insight into who you were talking with there.

MK: I mean, it, it's hard to sort of –

JC: How much time out of the day were you spending doing this? Is this pretty much the bulk of your day as you're doing on the computer, still doing your –

MK: When I was –

JC: -- keeping busy.

MK: When I was at Fox, I took about two months to sort of not do anything, you know. I, I really didn't know what to do.

JC: Mmm hmm.

MK: I had never been unemployed before. It was something that I was kind of

bracing for, and people are like, I knew, I had a feeling it was going to happen. You know there were changes that were happening at the company. There were people that were getting let go. A lot of the innovative people that they brought on initially were being let go. And, um, rightly so, for reasons that, you know, they should have been let go for, for sending [UI] emails and for, you know, not meeting certain initiatives. But, I just knew that there was a cleaning of house that was taking place, and I felt like at any point I'm going to become a victim of this. And, two or three weeks later it happened.

JC: Sure. So, you're spending a lot of time – At some point you did actually meet some folks though and did get some private message and chats with folks, uh.

MK: In the chat room?

JC: Well, from the chat room. Or, in the chat room. You were actually communicating, and –

MK: Or on the IRC server we'll say

JC: Yea.

MK: [UI]. Yea, um, I, I threw something out there in the main chat room, and I again, forgive, I don't remember what it was.

JC: I understand.

MK: Um, I'm sure you have logs of it somewhere.

JC: We do, and I, I don't wanna, uh, prompt your memory. I'm trying to get your recollection, so.

MK: To the extent of you know that I used to work at Fox or, you know, I have something or other from Fox, or I tried far, to play the Fox, the Fox part high.

JC: Yea.

MK: And, it was, it was playing to ignorance more than anything because you – I don't want to say too much because my roommate works for Fox.

JC: Right.

MK: But, um.

JC: It's ok

Continuation of FD-302 of  Transcipt 1D1 & 1D2 , On  10/04/2012 , Page  24 of 86

MK: You understand how the public perception of –

JC: Of course.

MK: -- Fox News is

JC: Of course.

MK: Um, and so to get their attention that way.

JC: Yea. Did that work?

MK: It worked with Sabu.

JC: Ok.

MK: He reached out to me, and he said what do you have?

JC: Alright, so –

MK: And, then –

JC: Did you realize at the time who you were talking with?

MK: I didn't realize at the time who I was, I didn't realize who I was talking with until March 6th.

JC: Oh ok. [Laughter]

MK: So.

JC: Well, I didn't mean specifically. Did you recognize his significance in the Anonymous community

MK: No.

JC: -- as a talented hacker.

MK: I didn't recognize anybody doing anything at the time.

JC: Ok.

MK: It really wasn't until, um, that night that he invited me into the InternetFeds room. And, it was, it came from that sort of 15-minute conversation that I had where.

JC: Well, let's talk about that then because that seems to be kind of a

key, key thing.

MK: I, I told him that I had credentials for their CMS.

JC: Mmm hmm.

MK: And, he asked for them.

JC: Mmm hmm.

MK: And, I gave them to him.

JC: Right.

MK: Um.

JC: Why did you do that?

MK: Because I thought they didn't work.

JC: Ok. Now, that doesn't really square with what you were saying because, and, and I'm going to preface it because it's been important that we have complete candor and we talked about minimization, ok. Because –

MK: I understand this, I'm trying to remember.

JC: You're trying to remember.

MK: Right, I'm not trying to deceive [UI].

JC: Because my – and I – and here's my impression. And, and it would certainly be understandable how angry you would be at Fox News still, you know, Fox40, particularly. And, and how, uh your desire to essentially fuck 'em would be relevant. And, I think it's that part of how you said it in the logs.

MK: That was, I remember saying that later on down the line.

JC: Ok.

MK: Um.

JC: So, in the first instance –

MK: I had access to several different sets of credentials for the same platform.

JC: Because you gave them instructions, you walked them through –

MK: I –

JC: -- how to use it. Do you remember that?

MK: I recall offering some guidance.

JC: Ok.

MK: The other thing is that at, at Tribune at that point anyways things had been changing so much in terms of our CMS product, our, our online product. We were re-launching our website every six months when I was there. We were going from CMS to CMS to CMS.

JC: Ok.

MK: And, at the time –

JC: Well, I guess, the only reason I'm stopping you is because I don't want you to go down the path of I didn't think that they were going to do anything with that because I don't think that's true.

MK: No.

JC: And, I, I don't –

MK: But, what, what I thought they were going to do with it is I thought they would find some use for it.

JC: Ok. Yea.

MK: It wasn't, it wasn't –

JC: I mean it's not like you expect them to take out the entire network and destroy the company.

MK: From what, from what I can remember, there was a set of credentials that I gave them.

JC: Mmm hmm.

MK: That didn't work for me. Um. There were other credentials that I gave them that did work. Um, that I knew worked and expected them to use. At the time, though, I was –

JC: This was in the first instance that we're talking about.

MK: From what I can remember on the first instance.

Continuation of FD-302 of   Transcript 1D1 & 1D2 _____ , On  10/04/2012 , Page  27 of 86


JC: Ok.

MK: Yea. Because I didn't think that they would work. But, understanding the or maybe the lack of understanding to this matter how hackers work and how the hacking community works. I figured if anybody can figure out how to use these.

JC: They're still going to be able to make it efficient. And, that would build your credibility with the organization, perhaps? Or, is it, or are we still to screw with Fox or is it a little of both?

MK: I, I [sigh]. I think to be completely honest given the mindset, I think it was probably a little bit of both.

JC: I understand. I understand. Uh, ok, so we're in InternetFeds. It's with with Sabu. You don't really know how important he is yet.

MK: I'm invited into the room that night, the first night that I'm on the chat room. And, I didn't know what I was looking at. There were a lot of instances where I didn't know what I was looking at. But, my game was to find out what was going on. Um, my intention quickly shifted from let's give these hackers who don't get caught and can do some damage something.

JC: Mmm hmm.

MK: It quickly shifted from that to I think I struck upon something here that people don't know about that maybe people should know about. Um, and, I couldn't let them see that or know that. Um.

JC: So, was this, is this on the night where they talked about the Gawker hack and this type of thing. Or, is this, is this a later[UI].

MK: No, I think, I think if I remember correctly the Gawker discussions came up a few days later.

JC: Yea, ok.

MK: Um, I think what was March 11th that they, not March 11th. It was, um –

JC: Like December.

MK: It was like December 11th or December –

JC: December 10th or 11th.

MK: You know it was December that they released the Gawker password dump

that Kayla released.

JC: Right.

MK: The, the dump, and I didn't know that was coming. I didn't have prior
knowledge that that was going to happen. I kind of found out about it when
everybody else did.

JC: Ok.

MK: Um, but what I did know was that, uh, or let me say it this way. What,
what I was able to determine in monitoring the InternetFed's chat room was
that Kayla was taking a lot of credit for what happened with Gawker.

JC: Mmm hmm.

MK: I don't want to get too ahead of myself. Later on down the line I
learned that Kayla had an accomplice with the Gawker hack. And, I think his
name was Garrett. Does that sound familiar?

JC: Yea.

MK: Yea. Um, Garrett told me some things about him or her. I don't entirely
remember what they are, and unfortunately, I didn't save a lot of that
conversation. I saved some of it.

JC: Ok.

MK: Um.

JC; Is that on this hard drive?

MK: It may be.

JC: Ok.

MK: To be honest, I don't remember. It, it –

JC: There's another laptop out there. Is that your previous laptop?

MK: It is, but I don't think I did anything with it, um. I can't recall
doing anything with Anonymous on it. There may be some stuff on there,
though.

JC: Ok.

MK: And, you're welcome to take a look at. Well, you're going to anyway.

288A-SC-45485

Continuation of FD-302 of  Transcript 1D1 & 1D2                    , On  10/04/2012 , Page  29 of 86

[Laughter]

JC: Well, you know what, the fact that you're, you're willing to help us find it on there that goes a long way. I mean, that does go a long way more than you—

MK: John, I remember talking to you in April of 2011. And, you called me as I was moving.

JC: Yea.

MK: I don't know if you knew at the time that I was moving.

JC: Yea.

MK: Um, you called me as I was moving back in with my grandmother. And, I remember telling you at the time that, you know, as far as it came to what, you know, at the time, I was working on a story with *The Guardian* on what had happened.

JC: Mmm hmm.

MK: [UI]. Um, but I remember telling you that, you know, whatever you wanted, what- whatever I could give you, that I would. And, that, you know, that offer never really was rescinded. It was, it just got to a point where I started working in San Francisco, and there was no time that I had to dedicate to that.

JC: I understand.

MK: Please don't take personally the fact that your calls went unanswered and your emails went unanswered. The other thing was I was trying to figure out how to handle this. And, I never really got to a point where I could, you know. I, di- , as a new employee at Disney, it's kind of weird to go up to them and say, 'I think need some legal counseling on how to handle this story,' you know, that I'm not working with on, you know, for your organization on. That it's something that came out of something else.

JC: I understand.

MK: Um.

JC: I mean, you know, I'm like you. I mean you're professional. I am a professional, you know. I'm just, uh –

MK: The difference is I think you know more about what you're doing than I did at the time about what I was doing.

JC: I understand.

MK: Um. And, forgive me as I don't want you to take this the wrong way, you probably are a little more seasoned to know what you're doing, you know. And, have had more experience doing what you're doing.

JC: Well, I appreciate your, uh, your, uh –

MK: It's not meant to be a compliment.

JC: Comment.

MK: It's just meant to say, it's more or less to contrast the fact that I didn't know what I was doing.

JC: Sure.

MK: [Laughter]

JC: Well, in your realm, you do know what you're doing.

MK: I know –

JC: As a, as a –

MK: I know more about what I'm doing now.

JC: Yea.

MK: I still am not entirely there. I still get in trouble at work, you know, for breaking certain rules that you know that, there, I think even at Reuters, that they're not used to, but um, you know, it's not, I don't want to say I get in trouble in terms of like I get punished –

JC: Ok.

MK: --or I get reprimanded or anything like that.

JC: Yea.

MK: But, it's more or less like there are things that, you know, Reuters is certainly doing things, and I have a certain way doing things and maybe it doesn't always match, but sometimes –

JC: Understandable.

MK: I think they see the incentive in what I'm doing. Um, I don't think I

was ever in a position like that with Disney, and so I felt kind of stuck between this story that, you know, it was never my intention not to cooperate with people on.

JC: Well, right now you're doing the right thing, and so.

MK: Right now I'm doing the right thing –

JC: It's –

MK: -- for you guys. [Laughter]

JC: Well, it seems that way –

MK: [UI] It's necessarily going to be the right thing for –

JC: Here's the issue just to put your mind at ease. And, you know, I really can't put your mind at ease totally. But, uh, everybody appreciates honesty. Um, and at some point in time, we're going to have to show this to a prosecutor, and it's been my experience that prosecutors are people, too. And, people appreciate honesty. And, you know, some people makes a mistake, you know, I mean that's, that's human nature. And, you just said that at, you know, Reuters you make mistakes. People make mistakes. It's, it's, it's something that you can work through. So, and in the scheme of things –

MK: I would say, before we, before we continue with the, um, Monsegur case.

JC: Mmm hmm.

MK: Fox had that story before anybody else did, and I don't know what, why that was. But, given that my roommate works at Fox News.

JC: Uh huh.

MK: And, there are FBI agents out on the couch outside.

JC: Uh huh.

MK: I'm very uncomfortable with that mix.

JC: Ok. It has nothing to do with that, your, uh, roommate.

MK: No, I understand.

JC; Or, the Fox News. Yea. I'm—

MK: As an editorial employee, though, you know [UI].

Continuation of FD-302 of  Transcipt 1D1 & 1D2                              , On  10/04/2012  , Page  32 of 86

JC: Yea, well, he's not going to see the warrant. He doesn't have a copy of the warrant.

GA: [UI]

MK: We can't predict what's going to happen.

JC: I can't predict anything.

MK: [Laughter] [UI]

JC: So, you know, here's the –

MK: I just wanted to make that clear.

JC: Yea, I understand. You know what, we're, our job is not to make news. Ok?

MK: It doesn't mean it doesn't happen though.

JC: I, I agree, but we're, we're not going to aggravate the circumstance with, you know, making news– So, whatever happens, happens. Um, and I can't control the future. I'm sorry. I just don't know what's going to happen.

MK: No, I understand. I understand, completely. So, Sabu and I are chatting. Um, I give him a set of credentials that, frankly, I didn't think were going to work, but I didn't know. Um, per my recollection, he invites me to the room. There's about, I think I did a head count at one point, one of the hackers executed some command line that showed you all of the people that had access to that room.

JC: Mmm hmm.

MK: And, there were between 33 and 36.

JC: Mmm hmm.

MK: There is an exact count on one of those logs that shows every username of every person that has access to that room. And, as far as I can remember those logs still exist.

JC: Yea, they do. When you saw that, did your heart jump a little bit?

MK: I didn't see it right away.

JC: Oh ok.

288A-SC-45485

Continuation of FD-302 of ___Transcript 1D1 & 1D2_____, On __10/04/2012__, Page _33_ of _86_


MK: I mean it's not something that they showed me on the first day.

JC: Ok.

MK: I can tell you the first couple of days that I was in that room I
didn't sleep well that night.

JC: Because?

MK: I had never been subjected to an environment as a journalist or just
even as a human being. I, I just never seen what I saw in that room before.
It took me aback. I wasn't expecting it.

JC: What was it, what was it? Try to characterize it as best you can that
caused the distress for you.

MK: A group of individuals who could do significant damage who felt free
discussing in the presence of people they didn't know, doing significant
damage and not getting caught.

JC: So, these were people that were malicious, and to a certain extent –

MK: I think they were malicious without a cause.

JC: And, and dangerous. [Laughter] To the extent that they were kind of
loose cannons?

MK: What concerned me was, you know, I, I think early on I saw, you know,
and I don't remember if it was that night or if it was, you know, over the
course of a couple of days, but it became very clear to me, and this is
something I told, you know, that I told Parmy, and I've told a couple of
other people. It became very clear to me that these were the people who
were doing the most damage. The kind of things you would hear about on the
news, you know, which unfortunately, I was not contributing to the news
product at the time. Um, I mean I kind of was, and we'll get to that in a
second. But, for the most part, I wasn't. Um. It, it was, it [sighs]. A few
things stressed me out. That was, um. I mean it's ,it's still even just
thinking about it, like the gravity of the skill that was in that room and
blatant disregard for any kind of consequence.

JC: Mmm hmm.

MK: Was just, I had never seen anything before like, like that.

JC: Sure.

MK: I mean, it, it was just, it was something that was incredibly a new

thing.

JC: I understand.

MK: And, part of it was, you know, what could these people find out about me? You know. I'm taking a terrific risk on two levels. One, being there, with them, taking a risk of, of them doing something. And, two, being there with them, and, you know, having it come across to the people who enforce the law.

JC: Sure.

MK: Now, I don't want that to be interpreted as, you know, I knew what he was doing was breaking the law. I really didn't at the time, you know. My rationale –

JC: But, at some point, you did. But, we'll get to that later, I suppose.

MK: I think, you know, I [sighs]. I didn't do my research. I messed up there. I didn't look into it as much as I should have.

JC: Mmm hmm. So, it was like the old boiling frog syndrome where you kind of just—

MK: I don't know what that means, but I started investigating a story before I did.

JC: You didn't know what you were getting [UI].

MK: [UI]

JC: And, it kind of built, and built, and built, and then before you knew it, you were.

MK: And, I took some action before I did a proper background on it.

JC: Ok.

MK: My mentality was I have the keys to a house that were never taken away, you know. And, that was one thing that frustrated me about Tribune is that there were so many things that should have happened when my employment ended that didn't happen.

JC: Yea.

MK: You know, they didn't ask for my security key back. And for my house – er, I'm sorry into my house – into my office. And, they didn't ask for, you

know, they shut down my access to my email, my work email, which was one of the reasons I was upset that day. Um.

JC: But, they didn't take the proper measures for security.

MK: No.

JC: They were very –

MK: And, it was one of the things when I was working there I had always told them they needed to do.

JC: Yea.

MK: You can't let an employee go and have a forward-facing content management system that anybody can access from the Internet and not take those credentials away.

JC: Clearly.

MK: I was going in manually as a web producer, and none of my job, my job is not information technology or anything –

JC: Mmm hmm.

MK: --with computers and removing access to these profiles after, aft- long after people have left , that anybody could get access to, and the company never seemed concerned about it.

JC: Yea.

MK: Um, and that was frustrating working there.

JC: Sure.

MK: Um, because my concern was always something like, you know, a hacking attack or, or getting access to information, you know, would compromise the integrity of the brand, you know. It, it, it would look very bad to our viewers. It would look very bad to our, our other employees that we looked like we were incompetent. And, it wasn't because I was incompetent. It wasn't because my manager was incompetent. It was just because the process, there really wasn't one, I think, you know, one of a process.

JC: Mmm hmm.

MK: I don't want to ramble on about things that don't matter.

FD-302a (Rev. 05-08-10)

288A-SC-45485

Continuation of FD-302 of  Transcript 1D1 & 1D2                          , On  10/04/2012 , Page  36 of 86

JC: [UI] matters.

MK: The reason why I felt comfortable with the credentials is because they never deactivated it.

JC: I understand.

MK: And, they knew that I had it.

JC: Yea.

MK: This is not something that they didn't know I didn't have. They knew I had it, and they did nothing about it.

JC: Sure.

JC: Careless, lax on their part, but almost, did you count it as then it's almost as if it's your property since they let you have it. Or, not quite sure how you really felt about it.

MK: It's not –

JC: It's hard to put yourself back in the mindset of that time.

MK: It wasn't my property. It was, they were keys that I had access to.

JC: Right.

MK: That's how I looked at it. I still had access to—It would be as if a server was a building.

JC: Mmm hmm.

MK: It's a physical object.

JC: Sure.

MK: You know, and I had a key to a physical building. Let's say I was the night manager at a retail store.

JC: Mmm hmm.

MK: And, they gave me the keys to the building to lock up at night.

JC: Ok.

MK: When you leave, you're supposed to take those keys back. You don't want that employee to still have access to the keys.

288A-SC-45485

Continuation of FD-302 of  Transcript 1D1 & 1D2 _____ , On  10/04/2012 , Page  37 of 86

JC: That seems logical.

MK: It makes sense to us.

JC: Yea.

MK: We get it. We think that way. It doesn't make sense to them.

JC: They didn't do it.

MK: They don't think that way. And, for two and a half years, I tried to get them to think that way, and say, look, something could happen, you know, and you would really have no recourse for it. You know, you could say, you know, the servers are our property, none of the credentials were misappropriated as I saw in the complaint that was filed back in March.

JC: Mmm hmm.

MK: Well, actually, it was filed in August.

JC: Yea.

MK: [UI]available in March. I've read all of that. I've had access to PACER [Laughter]. Um, you know, you could say all of that, but at the end of the day, you have to answer for the fact that you didn't take those keys away. Was it misappropriated? It was misappropriated to the extent that I gave it to them.

JC: Right.

MK: You know. But, was it really? The company gave me access to a product and didn't take it away.

JC: I understand.

MK: You know. And, it wasn't even the fact that they didn't take some of it away. They didn't take anything away.

JC: Alright. Clear, well, and it's been, it's been over a month though, at least. Because October, November, here you are going –

MK: It was at least a month and a half to two months. And –

JC: I can hear some noise out – I'm going to step outside because it's distracting, and uh, uh, talk to the [UI]. I'll be right back. [UI].

JC: [UI]. He's talking freely, and uh. I'm going to come out with the hard drive.

UM4: Ok.

JC: As soon as I can get it. But, uh, we don't need to do any searching

UM4: We haven't searched anything, so.

JC: Ok.

UM4: There are other computers, laptops, iPads, um.

JC: [UI]

UM4: The roommates say they don't, he doesn't have access to them.

JC: Leave them.

UM4: Alright.

JC: Yea, leave those guys go. Uh, so this guy has been fully cooperative. So, I'm going to get some pictures. Then he's got this laptop which I think we can take his old laptop. We've got a new laptop which we may take. And, then we got this hard drive. We're definitely going to take. Ok? And, uh, [UI].

UM5: [UI] bring that stuff out

JC: Yea, I'm trying to, but uh, I don't want to break the flow.

UM5: Maybe we'll cut some people loose.

JC: That's totally acceptable. I would say, yea.

UM5: [UI]

JC: [UI] completely cooperative in there.

UM5: [UI]

JC: Yea, I'm just, uh, I can hear the noise out here, and there's a lot of guys out there. And, he has a roommate.

UM5: [UI]

JC: And, I was thinking that, uh.

Continuation of FD-302 of  Transcript 1D1 & 1D2                    , On  10/04/2012 , Page  39 of 86

MK: [UI] do anything about our neighbors or anything like that?

JC: No, no.

MK: They're welcome, they're all welcome to come in.

JC: Yea.

GA: [UI]

JC: Yea, I just didn't, uh, you know, want to cause any problems with your roommates. And, then if they wanted [UI].

MK: [UI]

JC: Alright. [UI] I'm guessing

MK: [UI]

JC: Sorry about that.

GA: So, you were saying then that you gave one set of credentials –

MK: I gave one set of credentials to Sabu.

JC: Mmm hmm.

MK: Um, I didn't know what he was going to use them for, but at the time I really wasn't concerned about it. I figured, I didn't even know if they'd work, to be frank. Um, I did have access to a set of credentials that I did know worked. I don't recall giving that to them.

JC: Mmm hmm.

MK: I may have. I don't really remember. Um, but –

JC: Well, we'll refresh your memory on that I suppose cause we've got those logs, and we can show you and you can.

MK: Sure. Um.

GA: And, at some point actually, you, once you gave them credentials you saw that they were using them effectively, so you knew they worked at that point, right?

MK: I did not monitor what they were doing with it. They were telling me that there were certain things, you know, that, that they did eventually

get access to the content management system. As far as I know, they didn't
have access to anything internal. And, by internal, I mean, something that
is not forward-facing, something that you would not otherwise be able to
access by the Internet.

JC: Mmm hmm.

MK: Our content management system you could [UI]. Tribune's content
management system you could access through the Internet. Um, again, that's
one of those things I always thought was a flaw on their end, but
regardless. There were actually two content management systems. They were
identical. Um, and they both did the same thing. They both fed into the
same server. The only difference was that one was internal. One was
external. But, they were the exact same thing.

JC: Mmm hmm.

MK: It was just how you got access –

JC: Sure.

MK: -- to them was different. Um, but the credentials worked across the
board. The login pages looked identical. I'm sure you've seen all of this.

JC: Mmm hmm.

MK: So, um, you know, they were, they, they would tell me that they saw
certain things, that yea, clicked to me, and they told me that they saw
certain things that I didn't even know were in there. Um, it became clear
to me after a while that Tribune must have at some point known that this
username was out in the wild. They were telling me things that even working
at Tribune I had never seen before, but somebody at Tribune had to have
gone on their end and unlocked a lot of doors. Um, it was almost as if, you
know, and please don't take this out of context because I don't know that
this is true, but based on my observations, it was almost like they were
given super user access.

JC: And, that surprised ya.

MK: Well, I had never had it before. [Laughter] So—

JC: Yea. So, you gave them the account, and they were, and you were
surprised how effective they were in terms of amplifying it right?

MK: I don't think that anybody who looked at it from the outside wouldn't
have been able to figure out how to turn that on. In my opinion, you know,
again, you guys probably know more than I do. In my opinion, it came across

to me as if somebody at Tribune had turned something on.

JC: Ok.

MK: They, they may have done it not knowing the circumstances –

JC: Right.

MK: Behind who had access to that account. They may have done it –

JC: but somehow this account that you gave them became more powerful than you thought it was going to be.

MK: Yea.

JC: And, that's what you're telling me.

MK: Yea.

JC: Ok. But, is it that really surprising when you're dealing with these uber hackers that you're dealing with?

MK: If we're going back to the mindset that I had at the time, it did.

JC: Ok.

MK: Um, it really did because you know I, I, I felt uneasy about what I was seeing, and in the back of my mind I kind of knew.

JC: Kind of an oops moment.

MK: No, no Well, here's, no, what I'm trying to get at is – You know, the feeling that I had when I first got into the room of being uneasy and not being able to sleep the first couple of nights that was prefaced on the fact that there was appeared to be a blatant disregard for any kind of civil-civility or any kind of law.

JC: Mmm hmm.

MK: It just seemed to be doing things because they can do things. And, but, I, I really didn't have a good grasp and still, to this day, don't on what is possible on their end and what is not. You know, what they had and what they can do and what they can't do. I, you know, just based on my knowledge of Tribune and how the Tribune Company's CMS worked, if you're introduced to a new environment, kind of like I was, you don't inherently know what you're looking at.

JC: Sure.

MK: You feel overwhelmed by it, in fact. If it's, if you have an abundance of stuff. And –

JC: But, you talked them through it a little bit, I mean in terms of how to –

MK: Well, kind of

JC: Yea, what you knew.

MK: Very limited things that I knew.

JC: How to navigate.

MK: I, I know how to publish a story. They, they did publish an *LA Times* story. Or, they, let me clarify. Uh, they either published a new story or they edited an existing story.

JC: Now, are you referring to that 'Chippy1337' story?

MK: Yes, I think they edited an existing story.

JC: How did you feel when you saw that?

MK: Um.

JC: I mean, you knew there was a correlation, I'm, I'm sure. How did you feel?

MK: I didn't know what had happened until somebody pointed it out. And, by somebody, I mean somebody in the room.

JC: InternetFeds, yea.

MK: Um, and I really don't remember what my mindset was. It was –

JC: Did you go look at the story?

MK: I did look at the story—

JC: Ok.

MK: --and I saved a screenshot of the story.

JC: Alright.

MK: And, I don't think I still have access to that. But, I do know it's out there, um. And, I don't know where it is. But, I, I do know it exists somewhere. I have gone back and looked at it and seen it. Uh, it's still cached on a Google server I'm sure.

JC: So, you don't really remember how you thought about it, I guess I'm trying to get a sense of, uh –

MK: How I found it was somebody in the chat room linked to it.

JC: Linked to it. And, then, but you know, when, but ultimately you were responsible for that because that's what I'm trying to understand as far as like, 'Oo, I wish I hadn't done that,' or was there a –

MK: I didn't –

JC: Not that serious feeling? Or, what were you feeling?

MK: I didn't go into the server and change anything.

JC: So, you felt removed from that?

MK: To be completely honest, I felt like I incited it.

JC: Ok.

MK: But, as far as what they did in the server, or when they had access to the CMS, you know, I don't recall ever suggesting that they do certain things.

JC: How do you feel about that now?

MK: Um.

JC: Looking back.

MK: I feel like now it had minimal impact.

JC: Ok.

MK: And, that was something that wasn't really addressed by Tribune. Um, it, it had very low impact.

JC: Alright.

MK: And, to be honest, I was surprised because this is a group that has always had high impact. But, what apparently happened was there was one

user in the room. I don't remember what their username was. It's probably
in the logs, and when I see it, I'll, I'll remember it. There was one
person in the room who took it upon themselves to sort of be a little bit
of individual shenanigans. And, um, it really upset Sabu because Sabu said
he had big plans for those accounts, um, and by those accounts, what I mean
is they eventually, I fully believe, based on the conversations that we've
had within in the room that I wasn't always a part of, but did observe, I
believe they had access to other accounts.

JC: On the CMS?

MK: I don't know how they had access to them.

JC: Mmm hmm.

MK: I really don't know what that process is like. Um, I may have at the
time, but I don't remember what it was like. I, I genuinely don't remember
how to do it now. Um, but, and I wouldn't see why they wouldn't.

JC: Sure.

MK: They had a month to sort of –

JC: Work on it.

MK: You know, poke around there. I don't think it was a very high priority
for them. Um, frankly, I think that they, I don't believe Sabu when said
they had big plans for the site. Frankly, I think that they looked at it
and they thought this is really not worth our time. And, the reason why
they let me sort of stay in the room for as long as they did is because
they didn't think that me being involved was going to, uh, let me rephrase
that. They didn't think of me observing them was going to, uh, do any kind
of, have any kind of significant impact on what they were doing. If
anything, I was kind of, if you think of it in terms of a schoolyard group
kind of thing, I was the kid who didn't really know anything, and they
could kind of throw back to it as like, you know –

JC: Sure.

MK: This kid didn't know anything but we kind of like being around him. Um,
and that was almost deliberate after a while, you know, uh, I, I did play
to that to find out, you know, sort of how they do certain things. And, I
can already tell you, you know far more about how they do certain things
than I did. I mean that there were things they were trying to explain to me
which just frankly didn't make sense.

JC: Mmm hmm.

MK: I don't have a computer background as far as I publish content to the computer to the Internet, you know. I don't really know how my online banking works –

JC: Right.

MK: -- for example, you know [Laughter]. Like, it's just, I don't understand the, the nuts and bolts of how things get from –

JC: Besides giving them the credentials to the CMS, um, did you do anything else to the system? Maybe help them do something that would be considered illegal?

MK: As far as I remember, I didn't.

JC: Ok.

MK: Did you have something in mind?

JC: Well, I don't want to prompt ya. Yea, so.

MK: Please, if, you know, I, I want to be completely honest, too.

JC: I know. I –

MK: So, you know, what I don't –

JC: And, it's like I said before, I'm com –I'm being honest with you. There's two issues I want to cover. One is this issue with giving 'em the credentials to the CMS. And, you've been candid about that. You've admitted your role in that, and you've been forthcoming. So, that's all good. The other issue I wanted to talk about was, you know, the, kind of the email stuff that went on with Fox afterwards. Now, I'm not sure as far as the legalities of that, but I mean, it did cause some heartache with them, and –

MK: The emails was, was to be antagonistic, you know. It was to be – it was, it was basically to show their viewers that this is a company that, you know, I don't know what that was about just now. But, um, I did see a I did see it, I'm very observant. Um –

JC: What was that?

MK: The head nod between the two of you. I don't know what that was about.

JC: Oh, I'm, I'm just looking over to see if Gabe [UI}. [Laughter]

MK: Oh, no. Oh, that's fine. Um, forgive me then.

JC: Oh no. You, you're reading things in there that aren't there. But, it's ok.

MK: I'm reading into a lot of things right now. This is, because I'm now going to have to you know –

JC: Process all of it.

MK: Right, you know, uh, and figure out where things go from here. Um, as far as, the emails it was, I don't think that. It was more or less hooliganism.

JC: Hooliganism. But, at the same time, you know, I was kind of struck by that, and I, I, and that makes sense. Uh, so we had the emails you took. Uh, you did actually contact some folks, you know, and, and screwed things up there for 'em. I mean, what was, it's just hooliganism? Were you trying to – who, who were you angry at? Was it Brandon Mercer? Was it the company, in general? Cause –

MK: It was, it was –

JC: -- because the employees were somewhat terrified, as well, as you would understand. Or, did you not, were you unaware of this?

MK: There was probably a lot of things that I wasn't aware of that, frankly, I don't care to know.

JC: Ok. I got to tell ya, I mean a guy like Joseph Huerta. I mean did you know him?

MK: I did.

JC: What, what were you thinking? Did you want to hurt him?

MK: Um.

JC: Were you angry with him?

MK: There were things that happened during the course of my employment there, and even afterwards, that you know, he was sort of responsible for.

JC: Uh huh.

288A-SC-45485

Continuation of FD-302 of <u>Transcript 1D1 & 1D2</u>                    , On <u>10/04/2012</u> , Page <u>47 of 86</u>

MK: And, I genuinely believe that there was an email that came back to me about one of my half brothers [UI] found me on the Internet that frankly I felt he was responsible for.

JC: Ok.

MK: And, still do.

JC: Alright. So –

MK: To the extent of that my observation certain [UI] he was using [UI]. Should say certain [UI} he was using.

JC: Right.

MK: Um, [UI] fit.

JC: And, you went through proxy servers for all of that.

MK: Correct.

JC: Now, you said you weren't a hacker, per se, but you did understand how to get a proxy server and how to use it.

MK: I don't understand what proxy server is, like, I,I don't understand the intricate details of a –

JC: But, so when you went to Yahoo! For example –

MK: [UI] Let me say this. It's not, I, I don't even know if what I was using was a proxy server. What I was using was a virtual private connection –

JC: Ok.

MK: Virtual private network.

JC: And, how did you set that up?

MK: I paid a company. They gave me software and had access.

JC: What company did you pay?

MK: It's called Overplay.

JC: Overplay.

MK: Yes.

Continuation of FD-302 of  Transcipt 1D1 & 1D2                                        , On  10/04/2012  , Page  48 of 86


JC: And, how did you learn about Overplay?

MK: I Googled, um, how to watch British television from the United States? And, Google, uh, excuse me, Overplay is an, is a service that bills itself an expatriate service where you can if you was in one country, you can watch live television or on-demand television from another country. Um, it dawned on me, um, and forgive me, I don't remember when I signed up for this service, initially.

JC: Alright.

MK: It dawned on me, though, that the service gave me a different IP address.

JC: And, did you check these IP addresses to see where they were coming from?

MK: I don't remember if I did, but I, but they were foreign to me.

JC: Ok.

MK: Um, what I can tell you is that, um, yes, I did, I did check them.

JC: Ok.

MK: In all [UI]. Forgive me for the brain lapse. I ran them through like a who-is-my-IP-service –

JC: Uh huh.

MK: -- to find out if they were coming from the country they said they were coming from.

JC: Right.

MK: And, what, and how, you know, how they were registered and things like that. And, this was before my involvement, my observation with Anonymous. This was, I think I was still working at Fox when I signed up for this service.

JC: Ok.

MK: And, it was [clears throat]. I was blown away by the fact that you could do this. I had never known this existed, and frankly, had I known this existed, I would signed up for it a long time ago.

FD-302a (Rev. 05-08-10)

288A-SC-45485

Continuation of FD-302 of ___Transcipt 1D1 & 1D2___ , On _10/04/2012_ , Page _49 of 86_

JC: [Laughter]

MK: You know, for a while, I, I wasn't a customer of theirs after a while.

JC: Right.

MK: And, I recently signed up again when the Olympics happened. Um, because we needed access to, you know, goo video. And, NBC is [UI]. Um, [clears throat]. It's totally irrelevant[UI], you asked me.

JC: I, I'm getting at you, uh, when you're sending these emails, you knew you were anonymous and not trackable by Fox News.

MK: I didn't know if I was not trackable. It never occurred to me to whether or not [clears throat] I was completely, you know, un-trackable. But, I, I was at least aware that there was an extra layer between me and anybody else.

JC: Yea. And, at the time, your, it's just harassment. What did you hope to accomplish by doing it?

MK: It wasn't even really harassment. My - well -

JC: Hooliganism or just defacement or what was -

MK: Looking back on it now, that's what I would classify it as. At the time, though, that wasn't my intent. What my intent was, is, as an angry former employee was to say to their viewers, 'Look, this is what's going on.'

JC: Mmm hmm.

MK: And, I remember one of the emails that I sent was about the, it's like an iPad contest, or some kind of contest that was going on that was my idea, by the way, which I'm glad they did. Um, but there was a contest that was going on, and the contests there are not ethically, um, and maybe not even legally, um, what's the word? Played, I guess.

JC: Sure.

MK: I mean, for lack of a better word, executed, and [UI]. The-there are certain practices that they do that I'm not sure if they're illegal or not, but was a concern to me when I worked there. And, I aired those concerns. And, I said, 'Listen, if somebody, you know, gets this out there, this could be really bad.' One of them was, you know, we did a contest called

the 'Cash Grab.' We were one of four TV stations to do this 'Cash Grab'
contest where we had like $100,000 and a $1,000,000, in singles and other
denominations that we gave a contestant the ability [UI].

JC: Mmm hmm.

MK: And, they got to keep whatever was left. Turns out, a local politician
was tapped to do that. He won. Um. [Laughter]

JC: [Laughter] What a surprise!

MK: [UI] mean

JC: Yea, I can [UI].

MK: He won fairly, you know. There was no—

JC: No, I, I –

MK: There was no deception going on there, but what concerned me was that
it became evident to me that management and other employees weren't aware
of the fact that we were on a delay on other broadcast services. And, the
reason why I bring that up is because one of the ways that you entered into
this contest was a number flashed on the screen at a certain time.

JC: Uh huh.

MK: And, you call that number, and if you were number 'x', you know, you
were thrown into this lottery system. And, one person was picked from the
lottery system and that's who got the opportunity to partake in the
contest. None of us thought this contest was a good idea. The employees
were, you know, that participated in it, um, but one of the concerns that I
mentioned was that we're on a delay on certain services. You know, when we
air the number on Comcast, on our in-house cable system, uh, or on Comcast,
um, it's not going out at the same time as people that are on Dish Network
or DIRECTV.

JC: Mmm hmm.

MK: And, they're getting it 10, 12, l 15 seconds later. And, they're not
getting the opportunity to participate, and it's simply because the
producers want to get it over with –

JC: Yea.

MK: -- as soon as possible. And, had that gotten out you know, it would
have caused a shit storm.

Continuation of FD-302 of  Transcript 1D1 & 1D2                              , On  10/04/2012  , Page  51 of 86

JC: Yea.

MK: And, rightly so. I mean that was an extremely insensitive and uncaring thing to do to viewers. I bring that up because [UI].

JC: Yea. Now, I see your point. Yea.

MK: That was one of the catalysts behind what was going on. Um, with the emails is that, you know, to sort of say, 'Look, there's all these gimmicky things that the station is doing to get you to tune in, and you guys are kind of suckering yourself into it because you're taking it in, but you're not being given a fair opportunity to –'

JC: So, it's, it's kind of a, in some sense it sounds to me like you were, you were upset and angry. And, in some sense, it's a righteous anger about some of their actions. Um.

MK: So, I sent emails, you know I was able to obtain emails from a separate content management system that, again, I still had access to. Um, I don't ever recall giving that to anybody involved with the Anonymous group.

JC: I think you offered to sell it to them, as I recall, in one of your, uh, things. Anybody, I think, you told them that you had a list through, anybody want to buy a list of Fox News?

MK: Yea, my, my, my honest intention was not to sell it to them. It was to provoke reaction.

JC: Provoke reaction.

MK: Yea. Um, so, right away, that would not have happened.

JC: So, you never gave them the email list other than, and the only way you used it was –

MK: To be completely honest with you, I don't remember if I ever did give them the email list.

JC: Ok.

MK: I really don't remember.

JC: Alright.

MK: I don't, I have no reason to believe they ever used it for anything, though.

JC: Ok.

MK: Um, but, I certainly did have a list. I don't remember, I mean, I really don't recall if I have that list now.

JC: At, at one point Brandon Mercer, as I understand it, called you up and confronted you with, uh, these emails, and you said, 'No, I have nothing to do with it.' Were you still angry with them? What, what was going on then?

MK: I was, um, I was angry with them for a long time.

JC: How do you feel now? Time heals all wounds?

MK: Um. [Pause]. There are days when I look back on it, and I think, you know, I don't think angry is the right word to use because I wasn't really angry. I would have been angry if I hadn't prepared for it and didn't know it was coming and didn't sort of see the warning signs. I was hurt by what happened. And, that's a word that, you know, in talking with other people about what had happened with my involvement with Tribune when I was being interviewed by ABC and when I was being interviewed by Reuters, you know, the issue did come up, why did you leave? You know, why were let go? And, you know, how do you feel about it? And, the word that I've always used, and I think is most appropriate, was that I felt hurt.

JC: Do you have any regrets, or rem-um, were you sorry now in retrospect about the whole, you know, doing this kind of hooliganism, and the –

MK: It shouldn't have happened. So, yes.

JC: Um –

MK: There is some –

JC: Because it, it seems like it's –

MK: There's some incredible –

JC: There's little payoff for it. It just seems so pointless.

MK: There's, there's, there's so many incredibly good people that work there.

JC: Yea.

MK: That still work there. Brandon is one those, I consider Brandon to be somebody that, you know, he gave me my first opportunity to work in television, you know, to, to work in news. I wouldn't be here, you know.

Continuation of FD-302 of  Transcript 1D1 & 1D2                          , On  10/04/2012 , Page  53 of 86


JC: I read some of those emails. He was, that guy was pretty upset. I mean he didn't know which way was up with those emails.

MK: Brandon?

JC: Brandon.

[Pause]

JC: If you were given a chance, would you apologize to Brandon about what you did?

MK: Yea.

JC: Ok.

MK; And, it would be sincere.

JC: I believe it.

MK: The, the hesitation was on two levels. You know, to do anything, and one was would I be indicting myself. Seems irrelevant at this point. And, the second is just embarrassment. Of, of, you know, trying to be the, of wanting, I should say, wanting to be the bigger person and not having been.

JC: Well, here's what I will tell you now and answer to that. First of all, you know, with regard to, uh, the past or the facts, you can't change what you did.

MK: Right.

JC: And, you can't change the facts.

MK: I agree, yea.

JC: And, so going forward from where you are sitting right here today –

MK: This is one of the reasons why I'm talking to you as opposed to saying, you know, I want a lawyer, or I want to talk to, you know, counsel at Tribune, or, again I'm sorry, Reuters or anything like that is because, you know, I did it.

JC: I know. And, but more than that the thing, and this brings me to my second point, is it's one thing to know you did it, and there's another thing to be, uh, to have sufficient character and sufficient humanity really to just face the truth and do the right thing for the people that were affected by what you did in the past – minor, major, in whatever way.

But, it's, it's a character issue, and I, and what you're showing me now is that you have that character. And, I, I admire that, I think that's, uh, I think that's a good thing, so.

MK: There are consequences for everything people do, and for what I do, for what other people have done, you know –

JC: Mmm hmm.

MK: -- there are, there were consequences for what happened at Fox. And, my concern was, you know, in being hurt was that there were not ever going to be any consequences.

JC: Yea.

MK: And, now, there were.

JC: Yea.

MK: And, by now I'm think-I'm going to back to my state of mind –

JC: Mmm hmm.

MK: -- in December. Now, there were. And, um, it didn't change anything.

JC: Yea.

MK: In terms of, you know, it didn't make me feel better.

JC: I know. Funny how that works, isn't it?

Mk: Of course beforehand I would have had no idea if, if it did or not.

JC: Yea.

MK: But, it didn't make me feel any better, you know, it, it frankly, one of the reasons why I asked Brandon out to coffee was because I didn't, like I said, initially, I didn't want there to be any animosity. I just wanted there to be, you know, I just wanted us to be able to work together again.

JC: Yea.

MK: Whether or not we have friendship or a working business relationship, I just wanted us to be able to work together again. And, for some of the people on the staff, we have been working together. You know, I've coordinated with their web producer, the person that now has my job, [UI] two days ago.

JC: Well, I haven't phoned Brandon in a while, but I did get to know him briefly. I talked with him a few times, and he, uh, strikes me as a, uh, the kind of guy that is not going to hold that against you in a significant way if, if you were to talk to him and, and essentially apologize.

MK: Brandon is, as a person, he is one of the most generous people you'll, you'll meet. He's one of the nicest people you'll meet. He's one of the smartest people, frankly.

JC: Mmm hmm.

MK: You know, as a manager, he's lousy. You know, that's –

JC: Not surprising how that combination -

MK: And, it's not because he was my boss, you know, and everybody has sort of animosity towards their boss, but, and, and, you know, America workplace America. I love the boss that I work with now.

JC: Yea.

MK: Um, but, as a manager, he just wasn't effective. A lot of people, a lot of good people were being let go that didn't need to be let go because of a direction that doesn't work. And, still to a certain extent doesn't work.

JC: Yea.

MK: You know, I mean I work in media. We look at each other and, and judge. We shouldn't, but we do.

JC: Sure.

MK: And, there are still a lot of people that, you know, there are people, frankly, that – I went to a party in December, that December and the hacking, was hacking, it wasn't hacking. The hacking was, was brought up at this party, and they were asking me, 'Who is Fox Mulder?' You know, 'Who—are you Fox Mulder?' and of course I was denying it. And, the sentiment there was, you know, you say they were terrified. I'm surprised to hear that because when I was at this party, the reaction that I was getting was it's about time. You know, somebody did something.

JC: Yea.

MK: And –

JC: I'll, uh, I'll characterize it this way. When I was called in after –

MK: I believe that Brandon was terrified. [Laughter]

JC: Ah, I don't know how terrified Brandon was. I talked to some of the girls there. They were genuinely upset, and I think their fear was –

MK: They were upset because –

JC: -- they didn't know who was behind this. And, there have been some other issues at the office because employee morale may not have been so great. They didn't know what was going on, and people have a fear of the unknown.

MK: I didn't –

JC: And, there was greatly sense of the unknown.

MK: I didn't help contribute to the fact that the employment or the morale was not the best.

JC: Mmm hmm.

MK: Because I walked out of sales meetings, and I threw fits in the newsroom, most of which Brandon were involved in. Um, as a manager, I think, you know, looking, not me as a manager, but looking at Brandon as a manager, there were certain things that, you know, were just were aired out in the public that I think he wanted, he felt were positive because he wanted to build a democratic work environment. But, in reality, shouldn't have happened.

JC: Right.

MK: Because you just can't manage people that way.

JC: I understand.

MK: You can't publically manage people that way. The argument that he and I had that ultimately left, you know, I decided that I wanted to leave after we had that argument on Thursday. I was officially terminated on Monday. On my paperwork it said I was laid off, which I think that they did that so that I could collect the unemployment which is [Laughter]

JC: Or, maybe not to hurt you in your future endeavors.

MK: The, the—

JC: It's hard to say.

MK: The, the people that ABC spoke with when I was being interviewed there told who would eventually become my manager that I was fired.

JC: Hmm.

MK: And, I had to un-dig that hole, and say, 'Actually, here's what happened.' And, I appreciate that they gave me that opportunity, but –

JC: Hmm.

MK: The – I genuinely believe some people were upset. I don't think that they were, you know, you spoke with them. So, you know.

JC: Yea, I speak to everybody.

MK: I'm, I'm just coming across this as based on my observation and, and how I used to work with them, and I still keep in touch with them. They never came to me and, and, you know, I, I think I know some of the people that you spoke with.

JC: Well, I mean I'm thinking of, uh, and I can't put names to faces, but I'm thinking of probably like more like secretaries. People that didn't, that had only been on the periphery, you know, of, uh, what was going on and knew that this sort of stuff was happening, knew that there was an issue, felt this un-described kind of threat to the organization and didn't know where it was coming from.

MK: There were some people that I think genuinely, you know, they love the brand, they love the company, you can do whatever you want to them and they are just happy to have a job.

JC: Yea.

MK: You know, and, I understand that. I completely understand that. And, if there's any sort of fear of, of being terrified it's because, you know, they're, they're more afraid of, of the fact

JC: The unknown.

MK: [UI] shake up than they are of what was happening. And, I'm just speaking based on, please don't let me characterize anybody, but I'm just speaking completely –

JC: How you perce-

MK: as a former employer there –

288A-SC-45485

Continuation of FD-302 of   Transcipt 1D1 & 1D2 _____ , On   10/04/2012 , Page   58 of 86


JC: I understand.

MK: --and understanding how things worked there.

JC: Ok.

MK: That's, I don't think this is, that's relevant to what we're talking about but, um. So, the reason, the emails, you know, I had access to emails, to email, to be more specific, I had access to email addresses of people who may or may not have entered this contest. And, it was based on credentials that I was given and never were taken away from me.

JC: Ok.

GA: Did the 'Cash Grab' contest [UI] you spoke about before?

MK: No, this contest was [UI] you know in coming up with this contest I believe was the iPad people [UI].

JC: Yea, yea the iPad, the Christmas, uh—

MK: -- it happened in December. Again, it was my idea.

JC: Yea.

MK: [UI]

JC: Uh, are you still in contact with anybody, uh, in, um, Anonymous hacking realm?

MK: I reached out to Jack Davies, uh, on the advice of Parmy to try and get him to do a story with, um, my boss who is, uh, a he's, he's a social media editor at Reuters and he also does technology assignments.

JC: Mmm hmm.

MK: And, I wanted to reach out to him to try to, um, uh, do a story. You know, he had written up a piece in the *Guardian* –

JC: Yea.

MK: -- that I'm sure you've read. Uh, you know, saying, 'Life is great without the Internet.' Uh, which I would really consider for two weeks. It's not that bad. [Laughter] You get used to it. Um, I wanted to sort of talk to him and have my boss talk with him and try and get perspective, you know, like have a cell phone number that Parmy gave me that I texted and I said, you know, my name is Matthew, I work for Reuters. Uh, I don't know,

you know, frankly, based on my text that I sent him whether or not he would
have known who I was.

JC: Yea.

MK: Uh, but I can tell you that I didn't hear anything from him, and I
emailed Parmy, and I said, 'You know I didn't hear anything from Jack.
What's going on?' And, he, she said, 'Well, he didn't get your text.' And,
I figured, well, it's an international number maybe that's why. Um, but,
uh, as far as keeping in touch with anybody with Anonymous —

JC: Yea.

MK: Uh, not since, my last involvement with, I want to be very clear when I
say involvement, it's more or less observant.

JC: Mmm hmm.

MK: I didn't hack into anything, committed no criminal offense, you know,
as far as I am aware of. Um, I think it was March. May have been January of
2011 was the last time that I was given access to the InternetFeds room.
From that point on, I really didn't go into the chat room, you know. I
would go in every now and then to just kind of see what was going on.

JC: When, when was this? March of this year?

MK: I believe it was — no. Uh, January of 2011 —

JC: Ok.

MK: -- was the last time I was given access to the room.

JC: Alright.

MK: I was in there for about a month. Uh, they shut the room down because
things were being leaked out. By me. You guys [UI]

JC: Yea.

MK: [UI]

JC: Oh yea.

MK: Um, and by that point, the damage that I had done in giving them those
credentials was already —

JC: Right.

MK: Done.

JC: And, just to clarify, when you say no criminal intent, I mean, I, I hope I've been clear, but, uh, it says at the end of the warrant, it says, uh, it is, uh, with regard to, you know, giving passwords, that's actually technically, technically illegal. I mean it's, uh –

MK: I didn't know that at the time. [Laughter].

JC: And –

MK: And, I've since found out, um, you know, I've since done more background research on this.

JC: Ok.

MK: And, um, I don't want to incriminate myself upon, you know, by saying, 'I did or did not.'

JC: Well, you're not making it worse than it already is or, or less. I mean it is what it is.

MK: I just want to be honest with you and tell you what happened.

JC: I understand.

MK: You know, as far as any kind of charges or indictment or admission or I think that will come later in some of the guilt or not. Um, I just want to tell you what happened.

JC: I understand, and I appreciate that.

MK: And, [UI].

JC: Yea, I mean going with, we'll, we'll go back I mean, but I do want to be clear. I don't want to misinform you because, uh –

MK: I understand what you guys have to do.

JC: You know, I mean there's particularly giving passwords, there's the trafficking passwords. Even taking the email list from Fox News after they terminated you. You know, that's technically a computer intrusion, and you're not supposed to do that, and you know, you knew you weren't supposed to do it.

MK: No, what I, I didn't, I didn't know that I wasn't supposed to do it. What I would say is that my mindset was I had access to things that they

288A-SC-45485

Continuation of FD-302 of  Transcipt 1D1 & 1D2                                   , On  10/04/2012  , Page  61 of 86

should have taken away.

JC: I understand.

MK: But, they didn't. So in my mind –

JC: I understand. Yea, it's not, uh, well, I mean I, I –

MK: I understand the perception.

JC: Yea.

MK: Don't get me wrong.

JC: No, I –

MK: I understand the perception, don't get me wrong. I understand the
perception, and I [UI].

JC: And, I see where you're coming from.

MK: [UI] legalities. But, understand that at the time, that was my mindset.

JC: Yea.

MK: Having looked at –

JC: Possibility of criminal charges were not really real to you at that
time that it could potentially happen when you were involved in that.

MK: Um, it didn't become apparent to me until March 6th.

JC: Which –

MK: When I read the complaint.

JC: On Sabu?

MK: On Sabu and others. Yea.

JC: And, that's why you sent me a little text. Were you unnerved by that?

MK: No, I sent you, uh, I sent you an email.

JC: Oh, it was an email, yea.

MK: Reuters wanted me to do a story on my involvement with, uh, my
observance –

JC: Right.

MK: --with the InternetFeds because that was a story that really hadn't
come out. And, Adrian Chen and I had, had traded, um, the Gawker writer,
had traded emails, um, back and forth. I had given him access to some of
the screen grabs. Um, as I did with Parmy and, and a few others.

JC: Mmm hmm.

MK: Some of which I don't remember to be honest with you. Um, and, uh, in
reaching out to you it was for a story.

JC: Ok. I understand.

MK: It was because I was doing a story and as a journalist you have to
reach out to all of the resources you have available, and, um, I, don't get
me wrong, I understand why you weren't able to respond. It doesn't surprise
me, frankly. Um, to answer your question about my, you know, going to the
chat rooms and being observant with Anonymous. January 2011 was, as far as
this is concerned, the last time that I went into any chat room or had
access to any chat room I was able to observe InternetFeds.

JC: Ok.

MK: When I was working at ABC, uh, we had Op BART happen in San Francisco.

JC: Ok, yea, yea.

MK: And, I went onto the chat room using a Disney computer and said is
there anybody that would like to talk us about this.

JC: Ok, but as a journalist?

MK: As a journalist. And, one person, and unfortunately, I, you know, I,
I'll be very honest with you, I don't know it was. If I, as far as screen
names or anything like that, you know, if you were to show it to me, I
wouldn't be able to say—

JC: Yea.

MK: --you know, who it was. I wouldn't be able to confirm or deny one way
or another.

JC: Yea.

MK: But, to be completely honest with you, as it stands right now, I don't

288A-SC-45485

Continuation of FD-302 of  Transcript 1D1 & 1D2 _____ , On  10/04/2012 , Page  63 of 86

remember the person's screen name. I don't remember the phone number that,
you know, popped up on my caller ID when they called in. I, I genuinely
don't remember any of that.

JC: Ok.

MK: Um, that being said –

JC: Alright.

MK: -- if you were to present me with like a chat log and said, 'What
happened?'

JC: Well –

MK: I wouldn't be able to confirm or deny one way or another.

JC: Would you be willing at a later time if we did, and you know, a better
venue, sit down and go over some of the chat logs? Uh, to, and explain who
was who that you're recollection and go over some of the names. And, um –

MK: I can tell you when I found out who Sabu was it did not surprise me
because he had been very candid with me.

JC: Yea.

MK: In one of our conversations he said, you know, I live in New York. I am
a, he told he was a foster father of two boys, turns out that was
inaccurate.

JC: If it came to a trial or a hearing would you be willing to testify?

MK: On this? Or, on –

JC: On anything. I mean –

MK: Uh, can I say yes now?

JC: Yea, you can say whatever you want. I mean, it's, uh, these are your
own words.

MK: I, I mean, I essentially I don't, I, I don't have full recollection of
–

JC: Yea.

MK: I can tell you that in terms of Op BART, you know, there was at least

one person that reached out and said –

JC: Ok.

MK: -- uh, I am willing to comment. We kept him anonymous as journalists for various reasons. At the time, it seemed [UI].

JC: I understand. I guess, one other thing is that, you know, we're, we're sitting here talking, um, at some point in time there is, you know, there's a prosecutor back in Sacramento we're going to have to share with him. And, what we are going to share with him is, is how forthright you were, how candid you were, how truthful you were, and that is going to be very helpful.

MK: As far as what happened with Fox is concerned. I did it. My- There were things that I did. I can't deny it. I'm not going to now. I don't think I ever really did with you. Um.

JC: I think what's interesting me to is, the, now that I'm thinking, uh. Well, let me just ask you this, would you be, uh, willing to put in writing, uh, what you did for review that process specifically admitting to the, um, taking the emails? Uh, and you can explain why, and then also turning over the passwords.

MK: As far as the going, you know being publicly –

JC: It wouldn't be, it wouldn't be a public record. This would be for the prosecutor. And, including a statement of remorse.

MK: Yea, it, and, and this would be, you know, this would not be part of any kind of court file, or –

JC: Well, I can't promise anything. Well, I mean everything is –

MK: By public, what I mean is, you know –

JC: You want this to be a private and not be released to the public.

MK: I, I would ideally like this not to be released to the public and, but I understand that, you know, the Freedom of Information Act and there's all these different things that –

JC: Well, there are other things to protect it as well. What we can say is, uh, we won't release it, and, and there are provisions that a judge could prevent it's release. Uh, a judge can do whatever he wants, but we can't make any promises.

288A-SC-45485

Continuation of FD-302 of ___Transcript 1D1 & 1D2_____, On __10/04/2012__, Page __65 of 86__

MK: But, I also understand that in working, you know, in, in, what, what you guys initially, I think, overall are looking for is information and evidence.

JC: That's pretty much it.

MK: Um, I don't think there is, as far as the hacking collective, I don't think there's really, there's, you're not going to get much from me, you know. And, it's not because –

JC: You know.

MK: I don't want to offer it. It's because I can't, you know. And, by I can't, I mean I don't physically have the ability.

JC: The, the thing that you don't appreciate is you can't, uh, from where we're sitting, get the big picture, and how all of the pieces come together.

MK: No. I completely understand that anything at this point helps.

JC: Yea.

MK: Believe me. I, I'm not ignorant of the fact that any little piece of the puzzle is going to help put together the bigger picture. And, again, when you contacted me in April, when I was moving, my intention was not to hide anything that had happened. I had gotten a new job.

JC: I understand.

MK: All of it. Things for me have been working fine, you know. Even given this, things for me will still be fine. Um, at some point, you know, what happened today is not, did not come as a surprise to me.

JC: I, I'm sure.

MK: You know.

JC: Why, why don't we do this, why don't you start, uh –

MK: But, what I'm saying is [UI]. My concern is this eventually getting out there under my name, um, and I know that there are ways that, you know, like calling me a cooperating witness or, or something like that. There's, whatever in your ability to minimize –

JC: To the, and I, I –

MK: [UI] the impact.

JC: My problem is I, and I'm, I can, I will minimalize the impact. I will do everything in my power. My problem is that, uh, I can't, and I'll be honest with you, I can't foresee any reason why it needs to go to the public. Having said that, I don't control events in the court. So –

MK: Well, part of the issue is that this offense was c-c-committed against a news organization.

JC: Yea.

MK: And, they're going to do –

JC: I don't see why they would need to see it, and there are things that can be done. I will, I will ask that it be redacted and not made available to the victim. I can't promise it.

MK: It's ultimately up to the judge, I understand.

JC: It's ultimately up to the judge. In, in my, in my past experience, ok—

MK: Mmm hmm.

JC: Things like this don't need to be seen. Unless, it actually goes to a trial and there's some, you know, you know, this statement is used needed to make, you know, and you decide I'm, I'm go to a trial and we have to do something like that. Barring that, I don't see how it would come up in public, or be made available to the public. It would be a part of the FBI records. It would be shown to the prosecutor. Uh, it would be shown obviously to you because you did it. But, beyond that, I'm not aware of how that would be released.

MK: Well, here's the thing –

JC: Having said all of that, I don't want to make any promises.

MK: Like when you are, right now this is an accusation, you know. Um, I am not being charged –

JC: No charges have been filed.

MK: I have not been charged with anything.

JC: Have not been charged.

MK: I've not been convicted of anything. Um.

JC: And, it wouldn't be part of, if, if, if and when that you were charged, it wouldn't be, uh, part of that. And, all of that is going to be done –

MK: What do you mean it wouldn't be a part of that?

JC: Well, I mean, it, it wouldn't be incorporated like this as an affidavit. It, it goes you, you know, you know, [UI].

MK: [UI]. In terms of the writing, I'll write whatever you want me to write. [Laughter] That's fine. I don't want to give you a blank check, you know. So say, and, and make promises at least on my end that you know –

JC: I'm just giving you an opportunity to, to show remorse, to explain to the prosecutor and show that I'm fully cooperative.

MK: As far as this is concerned, whatever you need from me, you can have.

JC: Alright. Well, let's go ahead and, and –

MK: If you want me to, you know. If you're able to get information that leads you to an arrest of another individual. As a journalist, the consequences that happened to the people that I write about, and as far as I'm concerned, this to me, is not just a life experience, but it's now become part of a story that –

JC: Ok.

MK: I'm involved in because I injected myself –

JC: Yea.

MK: --into it as of March of last year. Um, my name is out there. People know that I observed this room. There, there are parts of my observations that have been published.

JC: Mmm hmm.

MK: I'm sure you've read them.

JC: Mmm hmm.

MK: Um, there are parts of them that made it into the book, and you've read it. [Laughter]. Or, you're getting through it. I have, actually, not read the entire book myself. Um.

JC: Well, your concern is uh –

MK: Two things. Two things. I would rather [UI].

JC: Ok.

MK: [UI] to be completely honest with you. You're going to talk to whoever you want to talk to that's involved in my life anyway. But, as, I can honestly tell you that the person you want to talk with about this is me.

JC: And, it's not our intent to go, for example, it sounds like your concern is your career and Reuters and these types of things. Is, is that what your concern is?

MK: Part of, part of it is my family.

JC: Ok.

MK: So.

JC: We don't need to talk to your family.

MK: I can tell you that –

JC: We don't need to talk to Reuters.

MK: Ok.

JC: And, you've been totally candid with us, and you're cooperating. I couldn't expect anything more from you, Matt.

MK: I've always wanted to cooperate on this story.

JC: I understand.

MK: You know, to be completely honest, had somebody called me where I am today, you would have no way of knowing this, but if somebody called me and said, you know, we're in New York or we're in New Jersey, we'd like to meet and talk with, you know, with you about what happened, [UI], away from work [Laughter] –

JC: Yea.

MK: Meet at a Starbucks somewhere or, or –

JC: Well, that's why we're here today. I mean we're not, we're not at your work.

MK: And, I'd love to continue to keep in contact with you. If you have a

card, or, or –

JC: And, we, we have a card. We're going to leave our cards. And, we will
certainly be in contact afterwards saying we've got to go back to, uh, you
know California, but uh, we'll be in touch with ya. And, you know, you'll
be a dial a –

MK: [UI] Jersey

JC: Yea, I could [UI] a nice place in Manhattan.

MK: I have to tell you, I love living here. I have –

JC: Well, this is the center of the world.

MK: I have great roommates who will probably leave soon.

JC: Well, hopefully that doesn't, and you know, and, and in retrospect, uh,
and, um, I'm going to leave you to write this thing here in a second
because I want to keep these guys out there and not mess up their lives too
much, but you know, they're going to look at this as a bit of an adventure
as well.

MK: I can tell you I want to write whatever you want me to write in your
presence.

JC: Ok.

MK: Um. I don't know that right now I'm in the state of mind where I can,
and it's not because I don't want to, it's because I want be cognizant of
any event.

JC: Ok.

MK: That you need me to recollect, and I just don't know that –

JC: Alright.

MK: As of right now –

JC: You're going to have the presence in mind to remember all of the
details.

MK: I just, I just don't, and I, I –

JC: Well –

MK: [UI] I ultimately want to make sure that whatever I give you is going to be helpful.

JC: And, and I, I can appreciate that.

MK: And I don't, I don't want to leave any detail out.

JC: Well, let me, there's, there's –

MK: I want to have a chance to look at this.

JC: Yea, I appreciate that.

MK: And, refresh my memory to these.

JC: There's three issues that I'd like to give to the prosecutor.

MK: Mmm hmm.

JC: Ok. First of all, uh, you know, I'm fully cooperative.

MK: And, I understand that time is of the essence, too.

JC: Nah, kind of the essence. I mean, I'd like to do it today. [Laughter] But, uh –

MK: We can do it today.

JC: But, uh –

MK: I'm just saying, in my pajamas, right now –

JC: Yea.

MK: I don't know that I can.

JC: So, there-there's a couple issues I'd like to get. One is, I'm, I'm cooperative. Two is, yea, I worked at Fox News, and I took the emails. Three is I gave the passwords to some guys on Anonymous. And, four is I'm sorry, and I regret my actions.

MK: I would like to give you whatever information is going to be helpful. [UI]

JC: But, I don't want, yea, I don't want to put words in your mouth, or –

MK: No, I understand.

JC: But, based on our conversation, I think that's pretty much what we talked about.

MK: Yea.

JC: And, it can be as simple as those four lines. But, I want it to be your words. And, uh –

MK: And, if that's what you're looking for, you know, we can put it on paper now. But, if you want something more detailed.

JC: It doesn't have to be detailed. What I'm looking for is –

MK: And, the conversation that we had today, as long as it doesn't interfere with, you know, my work, like I wouldn't be able to leave work at 2 p.m. –

JC: Yea.

MK: to say –

JC: Yea, what we'll –

MK: Unless there was, in certain circumstances there was a subpoena that I had to appear in court because, you know, you've caught a guy, and I might know something about it, and you want to –

JC: We're not going to call you at work Matt. What we gotta do is we got to look at the computers.

MK: What, what I'm trying [UI].

JC: [UI]

MK: There are certain, certain, you know, I'm going to have to go work today and say, 'Something happened.' You know. I, I, this is, our interaction is, it's not going to be in a news story unless somebody leaks it to like Gawker or Fox.

JC: Right.

MK: Or, anything like that. Um, I mean anything can happen like, like you said. I, I to tell you where I'm coming from I'm going to have to go into work today and tell my boss this happened.

JC: Mmm hmm.

288A-SC-45485

Continuation of FD-302 of  Transcipt 1D1 & 1D2 _____ , On  10/04/2012 , Page  72 of 86

MK: It doesn't have to be as detailed, and it won't be because I don't want
to compromise anything that you guys are working on.

JC: Right.

MK: I'm taking a step back as a journalist and saying this would, this
would be a story. I'm giving you my word that as far as my abilities will
allow, I will do what I can to ensure that this isn't one.

JC: Ok. And, what we –

MK: But, I do have to go to my boss.

JC: I understand. What you ask of us? What do you want us to do? How can we
help you?

MK: The first thing that I would like is a way to communicate with either
of you.

JC: Ok, alright, and we're going to leave our cards and our email address.

MK: Or, anybody, that, you know, I can get in touch with.

JC: Ok. And, that's going to be us.

MK: I know how to get in touch with you, cause I have your email but I
don't know that I have your phone number. Um.

JC: Alright. We're going to give you our cards.

MK: And, I think I still have your voicemail, too.

JC: And, I'll answer my phone.

MK: Um. I don't send out my phone number when I felt kind of [UI].

JC: Ok.

MK: Um. I also don't answer my phone.

JC: Ok.

MK: It's not, 'I don't answer my phone to you.' It's, 'I don't answer my
phone at all.' Um, the easiest way to reach me is by email.

JC: Ok.

MK: [UI] e-mail leave records. Um, and I would prefer to communicate –

288A-SC-45485

Continuation of FD-302 of ___Transcript 1D1 & 1D2___ , On __10/04/2012__ , Page __73 of 86__

JC: Face-to-face like we are now.

MK: Or, by via phone or via Skype or by a [UI]. But, um –

JC: I understand.

MK: I'm not really concerned about that. As far as copping to what I did, I'm willing to do that.

JC: Ok.

MK: As far as writing something and saying, you know, you're looking for four lines. I remember about two of those right now and you just said it about five minutes ago.

JC: I know.

MK: I'm willing to do that as well.

JC: Alright.

MK: Um, I would ask that as far as you're able to that this not become a public issue. Um, I understand that, you know, as somebody that has access to PACER and other, you know, ways, other, other databases that – What I would like to have happen, ideally, and what's going to happen are probably two different things. I'm very cognizant of that fact. Um, but I think in speaking with you today, you're more, you're more than willing to advocate for me.

JC: I am. I am. I understand, and I, I want to make sure I understand your priorities. You're, you're –

MK: I, I also understand that as far as your abilities there's only so much that you can do. That is not going to be, and I, I think is where you're concern is. That is not going to be a deciding factor in how much or how little I'm willing to cooperate as far as how much I'm willing to cooperate.

JC: I understand. And, like I say, I think you've judged me right. I am not, uh, here to make life difficult for you. I told you that at the beginning. We, we want you to have a successful career and to be successful in your endeavors, and we don't want that, um, to be derailed because of anything. Having said that, [UI] issues resolved, and, and we'll see where the chips fall. I mean, um, I can't predict what the future is going to be, but we're not going to go out of our way to hurt your career or your professional life or anything.

MK: You have a job to do, and I understand that. I, I do want –

JC: Why, why don't we leave him with a piece of paper and a pencil. I want to start on these computers because I got all of these guys out there, and I don't want them, um, with the roommates and, if that's ok?

MK: Are they able to come in here?

JC: Yea, what they got to do, typically, what we'll do is they want to photograph where, where it is in place. So –

MK: I've moved this since we've been in here.

JC: The, the laptop?

MK: Yea.

JC: Ok.

MK: Because I had to move –

JC: We'll make a note of that. That's still, they're still going to want to make a note that it was on the bed.

MK: And, that you're more than willing –

JC: And then –

MK: And, you're more than welcome to open it. I will give them the credentials to log into profiles.

JC: Ok.

MK: [UI] passwords.

JC: Oh, wonderful. Ok.

MK: Um, I would prefer not to tell you my password, but if you ask me for it –

JC: You know it's, uh, we can get that easy. It's all, uh, it's, we could get that easy, I mean it's hashed, the password is available.

MK: [UI] to a certain level. I understand that people can get those. Um, yea, I mean [UI].

JC: You know, again, it goes, it, uh –

288A-SC-45485

Continuation of FD-302 of  Transcript 1D1 & 1D2                    , On  10/04/2012 , Page  75 of 86

MK: [UI].

JC: Let me go get them, and you can wait here. Why don't you start on that, and essentially I'll give you, you can [UI]. One is cooperate.

MK: I will say though as far as [UI].

JC: Yea. Ok, I'll keep it on [UI]. Willing to cooperate, two is I did take the emails, uh, from, uh –

MK: Can I grab that paper from you because I'd like to write these down as you're saying them. Thank you.

GA: Yea, of course.

MK: And, I'll, I'll start a fresh piece [UI].

JC: But, I want it to be your own words, Matt. I mean, I these, these are the issues that I want to cover. One is that your willingness to cooperate. Two is the emails and, and Fox News in Sacramento that you took those emails and that you were sending them under the, uh—

MK: The third was the credentials, right?

JC: And, the third is that you gave the credentials to the CMS, uh, to the guys on – And the most important thing in my opinion –

MK: [UI] dated?

JC: Yea, if it helps, yea. I mean, uh –

MK: [UI]

GA: Yea.

JC: And, we're going to give this to the prosecutor largely to explain the key issues of cooperation and remorse which, uh, as you know are important given where you're at.

MK: And, I would be more than happy to speak with him or her as well.

JC: And, there, there will come a time for that because they're gonna wanna kind of go over.

MK: What I don't know is possible, and I'll be completely honest with you now, is I don't know that I could go to Sacramento to do it.

JC: We, uh, in terms of time? Or, in terms of money?

MK: In terms of both.

JC: Ok.

MK: Now, I understand –

JC: But, we'll, we –

MK: I understand you have resources to make that happen. Um—

JC: Well –

MK: Don't get me wrong, I've, I've covered enough of these.

JC: Yea.

MK: I, I understand how that happens. What I'm saying is in terms of, it's really in terms of time and taking time off from work.

JC: Well, it's, uh –

MK: [UI]

JC: -- there's other things we can do there. The prosecutor, there's, there's a situation called Rule 20, which all the legal stuff happens in New York.

MK: Mmm hmm.

JC: So, it, it just depends on the prosecutor, really. Whether they're going to do what they call a Rule 20 which essentially moves venue. You would waive venue, which is California.

MK: Which is what I think I did for Monsegur, right?

JC: Uh, [UI], I think they did. I think he waived venue. But, then, you gotta get the, yea. He would waive venue, but then you gotta cause yea any charging would have to be, done out here in New York. I, you know, anything, I mean again, we don't control that, but there are mechanisms in place to help you with your goals, and we'll make sure that gets communicated and give you an opportunity to communicate with the prosecutor.

MK: Sure. I would ideally like to communicate with the prosecutor before that happens. In a perfect a world that would –

288A-SC-45485

Continuation of FD-302 of  Transcript 1D1 & 1D2                                    , On  10/04/2012 , Page  77 of 86

JC: What we'll probably, uh, we'll probably have to figure out how to do the, the mechanism to do that.

MK: Let me tell you before you leave where, where everything is. Uh, there's a computer there.

JC: Yup.

MK: There's an iPad in there. There's one right there. There should be two hard drives in that, um, dresser. Uh, the TV has the ability to plug in the USB drive. There may be one behind the TV. There is a USB drive floating around here somewhere. Um –

JC: Let, let me get the guys who are going to collect it with the camera and everything –

MK: And, I'll tell them [UI].

JC: And, you can tell them where everything is.

JC: Hey guys, sorry to bother you, he needs, uh, he's got a camera, he's willing to show us where all the stuff is and what we're going to take.

UM6: [UI] camera, and he's got the log, so.

JC: Well, let's go.

UM6: Alright.

JC: Sorry, I'm sensitive to you sitting out here. [Laughter]

UMS: No, no, no. [UI]

JC: Yea, yea.

UM7: Alright, do we have a garbage bag?

UM8: What's that? I'll bring one.

UM7: Yea, just put one in the [UI].

JC: Have the roommates taken off?

UM9: Yea, yea, I think they both [UI].

JC: Ok. Are they, uh, calm, or?

UM9: They were fine. I think one worked at Fox News.

JC: Oh, ok.

UM9: So [UI].

JC: Trying to make, write a story or something?

UM9: Yea, I don't know.

UM10: Are you, uh [UI]

JC: Yea. Huh?

UM10: [UI]

JC: Yes.

MK: [UI]. I'm sorry, what's the time?

JC: It's 8 o'clock.

GA: Yea.

MK: It's 8 o'clock?

GA: Yea.

MK: Do you mind if – you guys can come in. Do mind if I go over there and turn the alarm off?

JC: Yea.

MK: Before it goes off.

JC: Yea.

MK: Ok. [UI]

JC: Alright, Matt's going to show us where the stuff is, and then he's got, he's going to write a little note there for us. And, your roommates are gone, so.

MK: They probably went to work.

JC: Yea.

MK: Um, smart phone right there, ok.

288A-SC-45485

Continuation of FD-302 of  Transcript 1D1 & 1D2 , On  10/04/2012 , Page  79 of 86

UM11: Do you want us to take overall photos first? Do you guys want to step outside?

JC: Oh yea, we'll step back. What, typically what they do here, Matt, is they'll take overall photos kind of show the layout of the room and everything.

UM11: [UI]

MK: Uh, I'll get to this, yea, in a second, I've, I've gotta –

JC; Well, just show them where everything is.

UM12: Yea, so smart phone is right over there.

MK: The smart phone is there.

UM12: Ok.

MK: Um, there's, uh, an Apple iPad in that bag.

UM12: Which bag? Are we talking about the smaller or the large one?

MK: The small one is mine. The large one is [UI].

UM12: Ok, alright. So there's an Apple iPad in there, ok.

MK: Um, there also maybe a USB thumb drive in there.

UM12: Ok.

MK: Um, there's also a Kindle.

UM12: Ok.

MK: I don't know if that's of any interest to you guys.

UM12: K.

MK: Apple i- uh, there's, uh, uh, an Apple iMac right there.

UM12: Mmm hmm.

MK: There are two hard drives in, I believe they're in this drawer of the dresser.

UM12: What about this one here? Is that in addition to?

Continuation of FD-302 of  Transcript 1D1 & 1D2 _____ , On  10/04/2012 , Page 80 of 86

MK: No, I'm sorry, this is one of the two. There's only two total. They're both Toshiba.

UM12: Ok.

MK: Um, there's a black one. There's also a gray one.

UM12: Is this the gray one right here?

MK: Oh, it is. So, they're both on the dresser.

UM12: Ok.

MK: Um.

UM12: Any thumb drives or anything?

MK: No, but you're welcome to look.

JC: How about behind the TV?

UM12: How about the Western Digital box? Do you have anything stored on there?

MK: So this is an Apple TV that –

UM12: Oh it is? I, it looks like the Western Di—

MK: To my knowledge there's nothing stored on it.

UM12: Ok.

MK: You're welcome to take a look at it if you need to. Uh, if the thumb drive is not in the – I don't want to touch anything. If the thumb drive is not in that bag, it's behind the TV. It's plugged into the TV.

JC: And, where's the data we're looking for, Matt? Which device is it on? Which, uh, hard drive?

MK: I don't remember which one it's on, but it's [UI].

JC: One of the hard drives, and is there, which laptop did you actually use to communicate with, uh-

MK: For some of it, it is, um –

JC: The one in there.

MK: The one in there.

JC: Ok.

MK: Mmm hmm. Sure. There's a computer in there. It's on the top shelf of the –

UM12: Ok.

MK: Closet.

UM12: Mmm hmm.

MK: There's a Roku Box somewhere around here, but it doesn't have anything stored on it, and you're probably aren't –

JC: Don't need that.

GA: Clarifying question there for you, Matt. Um, I know you said that the computer you used is in there, but have you transferred some those logs to your, your Mac as well?

MK: No.

GA: So, the Mac has no records of, of this [UI].

MK: I've plugged these hard drives into them, and I don't know to what capacity these hard drives can move data over. I can tell you that I haven't deliberately moved any data or opened any, any files on this computer pertaining to that. This computer is totally devoid of situations. The computer that, that I think you guys are going to be more interested in is that one in there.

GA: Just that there, and these two external hard drives.

MK: One of these has the files on it, and one of them doesn't. And, to be honest with you, unless I plug it in, I wouldn't be able to tell which one is and which one isn't.

GA: Ok.

MK: Um.

JC: Alright, what do you think here Gabe, do we want to, uh –

MK: One more thing.

JC: Yea.

MK: There's a third computer. I no longer have access to it and that is the computer that half of the communication took place on. It's since been crashed because it just didn't work.

JC: Where is that?

MK: I'm sorry?

JC: Where is that computer?

MK: It's, it's gone. I, I

JC: Oh, you threw it away.

MK: I, I no longer have access to it.

JC: Ok.

MK: It's just gone.

JC: Ok.

MK: Um, that having –

JC: Did you sell it? Did throw it away?

MK: That having been said it's since been disposed of. That having been said anything that was on that computer –

JC: Is on the hard drive?

MK: Is somewhere on there. So, it's in that zip drive that I told you about.

JC: Alright.

MK: So, I would love to be able to offer that up to you. I just don't have [UI].

JC: How did you dispose of it?

MK: So, I left it at my grandmother's house.

JC: Ok.

MK: And, she got rid of it.

288A-SC-45485

Continuation of FD-302 of  Transcript 1D1 & 1D2                        , On  10/04/2012 , Page  83 of 86


JC: Ok.

MK: Um, and I will call her and ask her.

JC: Alright. Uh.

MK: It may actually, we may actually been able, be able to – I don't know how she got rid of it.

JC: Alright.

MK: I'll ask her, and if it's something that I can reasonably get access to.

JC: Well, we won't reach out to her. I mean, uh, you've asked us not to contact your family so, uh.

MK: I, I will reach out to her, and if she can give me, if she –

JC: Knows where it is.

MK: If she gave it to a relative or knows where it is or, or disposed of it, I can at least figure out what she did with it. If she threw it in the trash or [UI].

JC: Alright. So, these we definitely need to take with us.

MK: This one.

JC: What else do we need take?

GA: The laptop out there. I don't think that we need to take this one. He's being forthcoming with –

MK: Would you like to look at it?

UM13: Um.

JC: I'll, I –

GA: I guess I could take a quick look through it while you make your, your statement.

MK: Sure, that's fine.

JC: And, uh, how about on the thumb drive? What's on the thumb drive?

MK: Thumb drive is exclusively used for work.

JC: Ok.

MK: So, that has, uh, passwords to our social media profiles. We were hacked into not too long ago, um, or phished. I think we were phished. Uh, and so the only thing on that, uh, thumb drive are Reuters passwords and movies because I play them on my TV [UI].

JC: Ok. So we don't need that. And, um, cell phones?

MK: And, again, you're welcome to look at that if you'd like. Cell phones. Didn't use that at all for the-

JC: Ok.

MK: The Anonymous thing. There is a text message that I sent to somebody that I think is Jack Davies. You're welcome to look at that. Um, but there was no response on his end.

JC: Ok.

MK: And, I don't even know that I was given correct information.

JC: So this, this, and the closet is what we care about.

MK: And, you're welcome to have those.

JC: Alright. Why don't you work on that for me, uh, your notes.

MK: Now, I know you guys can do forensics things.

JC: Yea.

MK: One other thing that I want to mention. These have never been erased. They are from, you know, from the day I bought them they've had information stored on them and taken off them. They've never been formatted. That computer has been.

JC: Ok.

MK: And, it has, and it's not because it was formatted due to anything involving this. It's because it got slow, and I just took everything off it [UI].

JC: Ok.

288A-SC-45485

Continuation of FD-302 of <u>Transcipt 1D1 & 1D2</u>                    , On <u>10/04/2012</u> , Page <u>85 of 86</u>

UMS: Was it formatted or was it wiped like zeroes and ones? I mean, was it, was it wiped?

MK: I did, um, so there's an option on the Mac, uh, where you can do like a secure, where it just rewrites the data a bunch of times.

GA: Ok.

MK: I chose that option. I think I got frustrated with how long it took because that computer is slow, and I canceled out of it and just did a fresh install.

JC: Alright. Well, we'll see what, uh, comes up on that.

MK: Yea, you're welcome to take them.

JC: So, it's a, uh. I'd do the forensics in Sacramento so I'm familiar with, uh, Linux – or the HFS. Alright, well, uh, you guys are ready?

UMS: We're ready, yea.

JC: Uh, you, you want to do it out here? Or you wanna –

MK: Yea. Can I grab that [UI].

JC: Yea, you can take your affidavit there, search warrant and.

MK: Alright.

JC: [UI]. And, I'll, uh, step out here with you.

MK: I'm going [UI] if that's ok?

JC: That's fine.

MK: [UI]

JC: Yea, why don't you, uh, just pick a chair. I'm going to pull this around for you here on that side so you can sit and take notes.

MK: [UI]

JC: That's our stuff.

MK: Ok.

JC: Yea, they're getting ready, we're getting ready to, uh – Oops, I'm sorry. I'm so sorry.

288A-SC-45485

Continuation of FD-302 of  Transcipt 1D1 & 1D2 , On  10/04/2012 , Page  86 of 86

UMS: [UI]

JC: Have a seat right there, Matt.

UM14: [UI]

JC: No, I don't think we need that. That's alright.

GA: Just trying to avoid.

JC: I'm going to step out for a second here. [UI] Alright So the time is 8:05 [FBI Note: 1D2 Ends] We started at a roughly – a little after 6 am.[FBI Note: 1D1 Ends]